## JACKSONVILLE PAPER CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 10571.

Circuit Court of Appeals, Fifth Circuit.

July 9, 1943.

Writ of Certiorari Denied Oct. 18, 1943.

See 64 S.Ct. 84, 88 L.Ed. ——.

Louis Kurz, Reuben Ragland, and Thos. B. Adams, all of Jacksonville, Fla., for petitioner.

Robert B. Watts, Gen. Counsel, and Earnest A. Gross, Associate Gen. Counsel, both of Washington, D. C., and J. Michael Early, Atty., National Labor Relations Board, of New Orleans, La., for respondent.

Before HUTCHESON and WALLER, Circuit Judges, and COX, District Judge.

WALLER, Circuit Judge.

Petitioner seeks to set aside, and Respondent to have enforced, an order of the National Labor Relations Board which held:

1. That the Everglades Paper Company branch of Petitioner had been guilty of discrimination in regard to the hire and tenure of employment of Henry Soriano, thereby discouraging membership in the union and, therefore, engaged in unfair labor practices within the meaning of Section 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(3).

2. That the Petitioner was guilty of interfering with, restraining and coercing its

employees in the exercise of the rights guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157, amounting to unfair labor practices under Section 8(1) of the Act.

The complaint alleged other infractions of the Act, some of which were dismissed, but on the charge that the Petitioner violated Section 8(5) of the Act by refusing to bargain collectively the Board stated in its findings: "Since it is not shown that the Union suffered a loss of its majority through any unfair labor practice of the respondent, the latter was under no duty to recognize the Union or to bargain with it. Consequently, we are of the opinion, and find, that the respondent has not refused to bargain collectively with the Union as the exclusive representative of the employees at its Miami branch, within the meaning of Section 8(5) of the Act."

The evidence was taken before Trial Examiner Howard Myers, whose rulings on the evidence and whose conduct of the trial were commendably accurate and fair.

 It is not for this Court to say that the Examiner and the Board were in error in believing the testimony of one witness over another. That is the peculiar province of the Board. But the Court is not without power to interpret or construe the testimony of the witnesses whom the Board and the Examiner have chosen to believe. It is within the province of the Court to determine whether or not words spoken and actions taken amount, as a matter of law, to unfair labor practices under Section 8 of the Act. It is the province of the Board to determine whether words were spoken or acts were done. However, the legal effect of the words spoken or acts done, and a determination of whether or not they amounted to a violation of the Act, may be a legal question and within the power of the Court to determine. It is also within the power of the Court to determine whether or not there is a total lack of evidence on which any particular finding could be predicated. It is also within the power of the Court to determine whether or not there is any ambiguity or inconsistency in the findings of the Board.[1]

The incidents and acts relied upon by the Board in the present case are:

1. That on January 20 or 21, 1942, eight employees had filed application cards to join the Union. Zink, the Union Business Agent, called upon Mixson, the Manager, and requested the latter to recognize him as the bargaining agent for the employees. The Manager referred him to the President, Mr. McGehee, in Jacksonville.

2. On the same day one Aaron, a truck driver, was asked by Mixson if he belonged to the Union and what he expected to gain by belonging to the Union, and if he expected to make anything after paying the Union off; that a racketeer had started the Union and a bunch of racketeers headed it, and that the employees could not hope to gain anything out of it. Witness Aaron's reply was: "I told him if it took racketeers to get us a raise and better working conditions, I did not mind it, and we did not get to talk very much further then, because Bauer, the shipping clerk, asked me about backing the truck up."

3. The witness Aaron further stated that he had a job offered him by the Southern Food Stores and that he went back to Mr. Mixson, the Manager, and asked the latter to call up Southern Food Stores and state that there would be no hard feelings if he, Aaron, took the job. Mixson then asked about the Union: "had it washed up; I told him I did not think it was; that I was not making any money, and I had to get another job, and as far as I was concerned, it was, and he said, 'would you give me a letter to that effect?', and I told him if he wrote the letter I would sign it."

"Q. What did he say to that? A. He didn't say any more then."

"Q. Did he write the letter? A. No, sir."

4. Henry Soriano, a witness for the Board, testified: "I asked Mr. Mixson if I had a chance of getting on steady, and he told me he had nothing to do with it, that Dick (Bauer) was the one that hired and fired."

 The above paragraphs one to four were all the conversations had by any witness with the General Manager, Mixson. There was testimony by witnesses as to what Bauer was reputed to have said that Mixson said, but which conversations were denied both by Mixson and Bauer. Hearsay testimony of this nature is receivable only as an admission against interest.

The only other agent of the company in any sort of a supervisory capacity who is

---

[1] National Labor Relations Board v. Virginia E. & P. Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348.

said to have been guilty of unfair labor practices is Dick Bauer, the shipping clerk, who had the right to hire and fire the truck drivers. The testimony before the Board revealed the following as to Bauer's statements and activities. The witness Zink testified that he and witness Aaron went to Bauer's home in the latter part of Jaunary and sought to get Bauer to join the Union. It developed Bauer had the right to hire and fire and, therefore, was not eligible. The witness Zink gave the following testimony as to statements by Bauer in Bauer's home:

"So, in the meantime, you know, *just in passing conversation,* I asked him about a fellow named Jack Mertz, that used to work there, that also was a member of the union, and why he was fired; that it had been rumored that he was fired for union activities, and I wanted to clear it up and see whether he was or not. He told me that they let him go because they found out he was in the Puritan Dairy strike, and had classed him as a labor agitator, and got rid of him.[2] Then, they had another fellow there, you know, the conversation led on, and Joe Chambers' name was brought up. At that time he was an employe of the Everglades, but previous to working at the Everglades he was with the Seybold Baking Company, which was out on strike at the time, and he had gotten a job at the Everglades as a driver; and, he says—(Emphasis added.)

"Trial Examiner Myers: Who says—

"The Witness: Dick Bauer said Joe Chambers was placed to go a couple of weeks previous to the night I was there; that he got orders from Jacksonville to let him go; that he was a labor agitator, and he told Mr. Mixson if they let Joe Chambers go, they will leave one of the best drivers they have go; and, due to that fact, they kept Joe on, and he was still working at the time and he continued to work until the Seybold strike was settled.

"Q. (By Mr. Wiggins) At this particular visit that you had with Mr. Bauer, did he say anything about any of the other employes, if you recall? Were any of the other employes, other than Chambers, discussed? A. Robert Aaron said that Mr. Mixson figured he was one of the ring leaders in organizing the Everglades Paper Company.

"Trial Examiner Myers: Who said that?

"The Witness: Dick Bauer.

"Trial Examiner Myers: Dick Bauer said what?

"The Witness: That Mr. Mixson figured that he thought Robert Aaron was one of the ring leaders in the organizing of the plant.

"Q. (By Mr. Wiggins) Did he say anything about how this would affect his job? A. You mean Dick?

"Q. No, Robert Aaron. A. You mean that Dick said it would affect his job?

"Q. Did Dick say anything about Aaron being a ring leader, or how it would affect his job? A. He said that they probably would let him go later on."

The witness further testified that neither Aaron nor Chambers was discharged by the company.

Witness Robert R. Aaron, a truck driver, corroborated witness Zink as to the discussion at the home of Bauer, and further added, when asked the question: "Did Bauer express himself as to what he thought about anyone?" "A. Only that he said that he had belonged to several unions before he came to work in Miami, and he was a 100 per cent union man, as far as he could be, but he could not be with us then."

The witness Aaron testified that he later got another job and quit Petitioner, and afterwards came back to the Company, requested his old job, and got it back.

The witness Soriano testified in regard to shipping clerk Bauer that he started to work for the Company under shipping clerk Bauer as a part-time employee; that the second week he was there: "Dick told me he *thought* he would put me on steady. He liked my work, and liked the way I run it." He testified that he ran a truck for a week and Bauer told him business had fallen off and he was going to lay up the truck and lay the witness off a little while until it picked up again, after which the witness did extra work loading and unloading box cars from time to time. (Emphasis added.)

He further testified that he asked Bauer if he had a chance to get back on as a regular truck driver and Bauer kept ignoring him, and that this continued for two weeks. That a few days later he saw Bauer and wanted again to know if he could get on steady, when Bauer said: "Well, you had your chance to get on steady, but, since you

---

[2] Mertz was not with the Company while the Union was being formed.

joined the union, and Mr. McAllister called Mr. Mixson and told him that you could not be fired, well, that let you out. You can't get back in steady." (McAllister was a Labor Conciliator.)

He further testified that he was never permitted to drive a truck any more although the truck was not laid up but was kept going by some other driver. When he again inquired of Bauer why they had let somebody else run the truck, Bauer replied that since the witness was the last one employed he would be the first to be laid off. The witness stated, however, that the man who was employed to drive the truck had not worked for the Company for about three months. He had been previously employed by the Company, however. The evidence showed that Soriano was never paid except on extra labor vouchers for extra laborers as distinguished from regular employees, who signed the pay roll. One of the extra labor vouchers issued to Soriano had the following notation: "Taking place of Ed Thompson." The date of the extra labor voucher was January 24, 1943. Other extra labor vouchers, under date of February 2 and February 3, issued to Soriano, were placed in evidence.

■ The testimony as to the President, McGehee, chiefly concerned the charge of refusing to bargain collectively, which charge the Board held had not been sustained, and it is unnecessary to review the testimony of Mr. McGehee, the President of the Company, except to say that he denied taking any action whatever in interfering with, or discouraging, the formation of a union. Likewise did Mixson and Bauer. The finding of the Board as to unfair labor practices, therefore, must stand or fall on the testimony of the witnesses Zink, Aaron, and Soriano as to the words and deeds of Mixson and Bauer. Although Mixson and Bauer denied the greater part of the testimony of the witnesses Zink, Aaron, and Soriano as to the disparaging statements the witnesses said they had made with reference to the Union, nevertheless, the Examiner and the Board chose to believe the testimony of its own witnesses. This Court must do likewise and assume that Mixson and Bauer made the disparaging statements attributed to them and under this assumption undertake to ascertain whether or not the statements made, and the inferences which the Board may draw therefrom, and the acts done in relation thereto, were such as were condemned by the Act.

■ The Act does not take away the employer's right to freedom of speech. The constitutional right of freedom of speech could not be so abridged as to preclude an employer from expressing his views on labor policy or problems so long as such utterances do not, by reason of other circumstances, have a coercive effect on employees. National Labor Relations Board v. Virginia E. & P. Company, 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348. We take it that an employer has the right to express his hostility to the Union if he has any. He has a right to express his opinion of the leaders of the Union, be that opinion good or bad. He is not precluded by the Act from inquiring or being informed as to the progress of the efforts at unionization. He has a right to inquire if the Union was organized or if it has "washed up", but the employer cannot under the Act use that constitutional right of freedom of speech threateningly or coercively, and especially when he has within himself the power to enforce his threats. He has the right to disparage the Union, but he does not have the right to discharge or threaten to discharge, or discriminate against, an employee for union membership or activities. He does not have the right to discriminate between union and non-union employees with the purpose and intent of preventing the free exercise of their right to join the Union. He cannot, while unionization is in progress or in immediate contemplation, discharge one or more employees without cause but for the purpose of having it as an example "to all others in like case offending" and to have the example hang over the heads of his other employees like the sword of Damocles. The Act does not prevent him from firing a man for cause or from refusing to hire one for good and sufficient reasons.

■ Granting that Mixson said the employees would gain nothing from joining the Union, and that it was organized by racketeers, and that he made other similar statements, such, standing alone, without threatened, coercive, or punitive action, is within the right of free speech and not within the condemnation of the statute. The Court is of the opinion that Mixson was opposed to the unionization of the employees, but the next question is whether or not he did anything coercively in the exercise of his power to hire and fire that was in the nature of a threat or that kept any one of the employees from joining the Union. There is no proof in the record

that any person was prevented from joining the Union because of Mixson's hostile opposition. There is no proof in the record that any person quit the Union because of Mixson's opposition. On the contrary, the Board found that it was not shown "that the Union suffered a loss of its majority through any unfair labor practice of the respondent, * * *." The only act that might be considered in the nature of coercion was the refusal to hire Soriano as a regular employee, which will be later discussed.

Next, we will discuss the words and doings of the shipping clerk, Bauer. It is noted that the first conversation of Bauer in reference to the Union occurred at his home and not in and about the business of the Company. The witnesses Zink and Aaron went to see him to get him to join the Union and "just in passing conversation" questions were asked about one Mertz and one Chambers. In this "passing conversation" Bauer gave the opinion that Mertz had previously been let go because of participation in labor strife with a former employer. It is not shown that Jack Mertz was ever a member of the Union in question or a member of the Union while he worked for the Petitioner. The witnesses also inquired about Joe Chambers. It had been rumored that two weeks before the Union organization started or before any talk of organization, Chambers was slated to have been discharged. Bauer intervened in behalf of Chambers and kept him on the job. Witness Aaron testified that Bauer stated that he (Bauer) had belonged to the Union and was a one hundred per cent union man. There is no proof that any man was fired from the Company by virtue of being a member of the Union. Aaron, who was a member of the Union, quit of his own accord, later came back and asked for his job and got it back. So the only coercive act, or act of intimidation, by either Bauer or Mixson was the failure or refusal to hire Henry Soriano regularly. The record shows, moreover, that Soriano worked as an extra laborer on several occasions after it was known that he was a member of the Union. We find that there is no testimony in the record to show that Henry Soriano was ever permanently employed as a truck driver or otherwise. He was paid at the end of each period that he worked with an extra labor voucher and for many years it had been the custom of the company during the tourist season or the rush season frequently to employ extra laborers and pay them with extra labor vouchers. This fact is undisputed.

Soriano's testimony is conflicting. He stated that during the second week he was there: "Dick told me he *thought* he would put me on steady." (Emphasis added.) He further testified that Bauer told him: "Well, you had your chance to get on steady, but, since you joined the union, and Mr. McAllister called Mr. Mixson and told him that you could not be fired, well, that let you out. You can't get back in steady."

He further testified that Bauer told him that he (Bauer) was glad the boys had gotten together and formed the Union. On another occasion, when asked about being given steady employment, Bauer said: "Well, I cannot tell you nothing about it. You will have to let it go at that."

All of the foregoing testimony by Soriano shows that there never was a definite agreement to give him steady work. Nevertheless, the witness, on page 96 of the record, when asked the question: "Were you ever advised that you would be put on regular work?", answered: "Yes." This answer is disputed by his own testimony.

His testimony showed that he never was unconditionally promised a regular job. Bauer admits that he told him when he first employed him that if he worked all right he would get a regular job and that if he came up to expectations he would get a regular job, which is entirely consistent with that part of Soriano's testimony that Bauer said he *thought* he would give him a regular job. The notation on the extra labor voucher issued to Henry Soriano January 24, 1942, "To take the place of Ed Thompson." does not fix any tenure or indicate permanency of employment, because he might take the place of Ed Thompson for a day, a week, or a month, and still be a temporary employee. The statement made by Bauer to Soriano that he (Soriano) had his chance to get on steady but since he joined the Union he had lost his chance to get on steady, indicates that he was considered but a temporary employee. Soriano drove the truck intermittently after it was known that he was a member of the Union and also was employed and paid on extra vouchers to unload box cars on several occasions after the fact of his union affiliations was known. There is nothing in the record to show that

Soriano was anything other than a temporary employee. The undisputed testimony is that Jack Davis, a member of the Union, an employee of the Fine Paper Division, and who was senior in service to the extra laborer Soriano, was given the job of driving the truck instead of Soriano.

However, there was testimony, which the Board believed, that Soriano was not hired permanently because of his union affiliations and that had it not been for his union affiliations he would have been given permanent employment as a truck driver, and there was testimony that Mixson and Bauer were antagonistic to the formation of the Union, which, coupled with the refusal to regularly employ Soriano, amounted to unfair labor practices within the provisions of the Act. The Board had the right, from the testimony which it believed and the inferences drawn therefrom, to so find, and this Court cannot find from the record that the failure or refusal regularly to employ Soriano was not due to unfair labor practices which resulted in discrimination against the tenure of Soriano.

The petition to set aside the order of the Board is denied, and the petition to enforce the same is granted.