## NATIONAL LABOR RELATIONS BOARD v. ROSS GEAR & TOOL CO.

### No. 9053.

Circuit Court of Appeals, Seventh Circuit.

Jan. 2, 1947.

A. Norman Somers, Asst. Gen. Counsel, of Washington, D. C., Josef Hektoen, Atty., of Chicago, Ill., and Gerhard P. Van Arkel, Gen. Counsel, Morris P. Glushien, Associate Gen. Counsel, and Dominick L. Manoli, Atty., all of National Labor Relations Board, all of Washington, D. C., for petitioner.

Carl Wilde and Owen J. Neighbours, both of Indianapolis, Ind., for respondent.

Before MAJOR and KERNER, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is a petition by the National Labor Relations Board for the enforcement of its order issued against respondent on September 20, 1945, following the usual proceedings before the Board. The order is based on findings that respondent, a corporation with its principal place of business at Lafayette, Indiana, (1) interfered with, restrained and coerced its employees by refusing to permit them to be represented by the union[1] the duly certified bargaining representative of respondent's employees with respect to grievances, and by making anti-union statements, in violation of Sec. 8(1) of the Act, and (2) discriminatorily discharged employee Mae Ford, in violation of Sec. 8(1) and (3) of the Act, 29 U.S.C.A. § 158(1, 3).

The contested issues are (1) whether there is substantial evidence to support the Board's findings of fact; (2) whether under the facts as found the respondent as a matter of law violated Sec. 8(1) and (3) of the Act, as charged in the Board's complaint, and (3) whether the Board's order is proper and valid under the Act.

The events with which this proceeding is concerned took place during the latter part of 1943 and the first four months of 1944. During that period respondent was engaged mainly in manufacturing steering gears for military vehicles and landing boats. The union filed a petition with the Board on October 7, 1943, following which an election was held on December 20, 1943, and on January 10, 1944 the Board certified the union as representative for the unit of production and maintenance employees.

While the examiner heard considerable testimony as to certain incidents which occurred at and prior to the election, no unfavorable finding is predicated thereon, and inasmuch as the Board does not here rely upon any of this testimony we see no reason to relate or discuss it. It is pertinent to note, however, that other than the findings now urged by the Board in support of its order, to be hereinafter discussed, there is not a scintilla of evidence of any hostility on the part of respondent toward the union or its activities. In fact, the record affirmatively shows that respondent's relations with the union and its members was amicable and cooperative.

---

[1] International Union United Automobile, Aircraft and Agricultural Implement Workers of America, UAW–CIO.

On the same date the union was certified as the bargaining agent for respondent's employees, that is, January 10, 1944, it held a meeting and elected its officers and a bargaining committee composed of seven members. This committee was also designated as the union's grievance committee. Mae Ford, the legality of whose discharge is in issue here, was elected recording secretary and a member of the bargaining and grievance committee.

Shortly thereafter, a series of conferences took place between representatives of respondent and the union, the first of which occurred February 18, 1944, for the purpose of agreeing to a contract between respondent and the union. These conferences continued during the months of February, March, April, May and June, and on the 16th day of June 1944 culminated in a contract containing, among other things, a detailed procedure for the handling and consideration of grievances.

The events with which the Board's findings are concerned took place in the months of February, March and April, 1944, while such conferences were in progress, and may be roughly divided into three categories, (1) the Pipher grievance, (2) the alleged discriminatory remarks of foreman Larr, and (3) the alleged discriminatory discharge of Mae Ford.

The facts as to the Pipher grievance are stated in the Board's brief as follows: "On February 10, Ford authorized Union Steward McKnight of the inspection department to present to Foreman Larr a grievance in behalf of certain employees in that department. When McKnight sought to take up the grievance with Larr, the latter questioned McKnight's authority to act in the matter. To McKnight's answer that he was one of the Union's stewards, Larr replied that he had no knowledge of McKnight's status and that he had received no instructions from respondent to take up any union grievance. Moreover, he continued, the grievance did not concern Ford herself and therefore it was none of her business. He advised McKnight against attempting to take up grievances until respondent and the Union had entered into a contract. Until that

time, he stated, he would consider no grievance except those presented directly to him by the aggrieved employee."

The so-called grievance presented to Larr was written on a form designed for the purpose of presenting grievances or complaints and read as follows: "Nature of Complaint: Why rules do not apply to all workers? Why isn't Rep Pipher's time card on check rack? Why is his card punched before he arrives? Why is it necessary for so much overtime to do his work? Reported by Mae Ford."

The Pipher referred to in the statement was an assistant to Larr, the foreman, and was not an employee within the unit represented by the union. While the alleged grievance presented to Larr by McKnight purported to be reported by Mae Ford, the record is silent as to which employees, if any, were interested therein. In fact, shortly after the complaint was made, Larr called Mae Ford to his office and, according to her testimony before the examiner, asked, "He asked me who were the people that were in back of this grievance?" She, according to her testimony, responded "that there were a number of people. I didn't care to mention names." Not only is the record silent as to who made or was interested in the alleged grievance other than the statement that it was "Reported by Mae Ford," there is no evidence which furnishes any reason or explanation as to what was meant or why it was made. True, the Board states in a footnote in its brief that the grievance was the result of dissatisfaction among certain employees concerning the activities of Pipher (Larr's assistant) which "they felt compelled them to work overtime." Respondent states that there is not a particle of evidence in support of this assertion, which we think is correct.

Under the circumstances related, we doubt the existence of a grievance within the meaning of the Act. Assuming its existence, however, and further assuming that Mae Ford as an officer of the union had a right to report the grievance on behalf of employees whose identities she refused to disclose, the still more dubious question remains as to whether respond-

ent can be held to have committed an unfair labor practice because one of its minor supervisory employees refused to consider it.

· In connection with the matter under discussion, another incident, much stressed by the Board, must be taken into consideration. On February 14, 1944, respondent's president, Usner, sent a letter to respondent's foremen, apparently approving Larr's action, a copy of which was sent to Narvin M. Hurst, president of the local union. In this letter it was stated that the union had the sole bargaining rights for all of the maintenance and production employees of respondent and that there would shortly be a series of conferences between representatives of the company and the union, with the end in view of negotiating a contract which undoubtedly would contain provisions outlining the procedure for the presentation and adjustment of grievances and that, until such contract was signed, there would be no new established grievance procedure.

· As already noted, the first of these conferences took place four days after the issuance of this letter, and by the process of bargaining a contract was agreed upon which contained a 'grievance procedure provision which, among other things, provided: "Any employee or group of employees having a grievance shall present the same in the first instance to his, her, or their immediate superior, accompanied, if desired, by the Shop Steward in the department in which they are working."

The Board argues: "The grievance procedure laid down first by Foreman Larr, and then by respondent's president, required that each individual employee take up his grievance directly with his immediate superior. The presentation of grievance by anyone other than the aggrieved employee himself was specifically prohibited. The employees were thus expressly enjoined from invoking the assistance of the Union, their certified bargaining agent, in the presentation of grievance to their employer."

We need not discuss or decide whether the Act requires an employer to bargain with a union concerning personal grievances of the employees, such as are presented in the instant case, or whether it is required to recognize the union as the representative of employees with such grievances in the absence of an agreement between the employer and the union relative thereto. That the mechanism for the presentation of grievances is itself a matter for collective bargaining is generally recognized; in fact, it was so recognized and as a result established in the instant situation. See Hughes Tool Co. v. N. L. R. B., 5 Cir., 147 F.2d 69, 72, 73, 158 A.L.R. 1165; Humble Oil & Refining Co. v. N. L. R. B., 5 Cir., 113 F.2d 85, 87.

We say that we need not decide this legal issue for the reason that the factual situation completely refutes the Board's theory that respondent enjoined or prohibited its employees from invoking the aid of the union in the presentation of their grievances. The so-called Pipher grievance stands alone on this record as the sole basis for the Board's contention that the respondent so acted, and this incident, in our judgment, is wholly insignificant when considered in connection with the undisputed evidence that respondent was willing to and did on many occasions consider and adjust numerous grievances presented by the grievance committee. Furthermore, Mae Ford, who had reported the alleged Pipher grievance, was fully aware of respondent's attitude in this respect for the reason that as a member of the grievance committee she participated with the respondent in the conferences which culminated in a contract, during which conferences numerous grievances were discussed and adjusted. Usner's letter, upon which the Board so strongly relies, expressly recognized and informed not only respondent's foremen but Hurst as president of the union that the union had the sole bargaining right for the employees. The union officials, especially the grievance committee, including Mae Ford, had actual knowledge and recognized Usner, John E. Strecker, respondent's industrial engineer and respondent's attorney as being in charge of respondent's labor relations and as its representatives in the matter of bargaining.

■ In view of this situation, we think there is no basis for a finding or contention that the respondent, because some supervisory employee refused to accept or consider the alleged Pipher grievance, had refused to bargain with or to recognize the committee as the representative of the union or had denied the right of an employee to have the union aid in the presentation of grievances. We further are of the view that neither an employer nor a union has any right, in the absence of an agreement relative thereto, to determine who shall represent the other for the purpose of bargaining or the consideration of grievances. Respondent was obligated to treat the grievance committee as representative of the union because the latter had designated the committee for such purpose. Conversely, we think the union was . obligated to recognize the known representatives of respondent as the ones with whom it must bargain and to whom it must present its grievances. The union had no more right in the absence of an agreement to rely upon a supervisory employee such as Larr as the representative of management in the presentation of grievances than respondent had to recognize and deal with some member of the union other than the duly designated grievance committee.

The Board further argues: "The narrow issue which this phase of the instant case thus presents is whether an employer who prohibits employees from invoking the aid of their certified bargaining representative in connection with the presentation and settlement of grievances thereby violates Section 8(1) of the Act."

The National Licorice Co. v. N. L. R. B., 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799, and N. L. R. B. v. Illinois Tool Works, 7 Cir., 153 F.2d 811, are cited as holding that such a prohibition constitutes a violation of the Act. We need not consider these cases, for the reason that no such issue is here involved. The issue is, as we think, whether the representatives of a union can, in the absence of an agreement, treat an ordinary supervisory employee as the representative of management for the purpose of entertaining an employee grievance, and particularly so when such repre-

sentatives have knowledge, as in the instant case, that grievances are being otherwise considered by management.

■ The alleged discriminatory remarks of Larr found by the Board, insofar as they furnish support for an unfair labor practice, are not only insignificant but frivolous. The evidence relied upon is Larr's refusal to accept the alleged Pipher grievance, his inquiry directed at Mae Ford as to the people who were backing the Pipher grievance and, when told by her that there were a number of people, his statement "that he thought so and that was the reason he did not fire her." On another occasion, Larr made the statement, "We haven't any union until we have the contract signed," and that prior to the execution of such a contract the employees had no "collective bargaining rights." The Board found that these so-called anti-union statements were violative of Sec. 8(1). We are of the view that they did not constitute substantial evidence of a violation. Undoubtedly Larr was mistaken in his view as to the rights of the union prior to the signing of a contract, but we are unable to discern how this· by any stretch of the imagination could amount to an interference, restraint or coercion of employees. We hardly suppose that members of the union obtained their legal advice from a supervisory employee or that respondent was bound by such opinion. Moreover, this is the sole statement made by any person connected with respondent's management which even the Board claims was hostile or derogatory to the union or any of its leaders. Such an isolated statement, even if given the effect ascribed to it by the Board, is not sufficient to support a finding. N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 342, 59 S.Ct. 508, 83 L.Ed. 682; Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624; Jefferson Electric Co. v. N. L. R. B., 7 Cir., 102 F.2d 949, 956.

This brings us to the discharge of Mae Ford, found by the Board to have been in violation of Sec. 8(1) and (3) of the Act. The Board found that such dismissal was because of her insistence on her right to have the union represent her at a meeting with respondent's personnel director. On

the other hand, respondent contends that she was dismissed because of insubordination.

We have read all the testimony heard by the examiner bearing upon the matter of the Ford discharge, not with a view of weighing it but for the purpose of ascertaining if there is any reasonable basis for the Board's finding that she was discriminatorily discharged. While she was a skillful worker and a valuable employee in many respects, she had a record for tardiness far exceeding any other employee in the department, and the evidence strongly indicates that she was a general trouble maker and possessed of an exaggerated idea of her importance. Her discharge took place April 11, 1944, and for several weeks prior thereto discord and dissension were rampant among the employees of the department in which she worked. As heretofore noted, Ford was recording secretary of the union and a member of its bargaining committee. It is a fair appraisal of the evidence to say that other women employees disliked Ford and that numerous disputes developed. Some of the controversy was between union and non-union members, but more of it was between those who favored and those who opposed cigarette smoking by women while at work. Ford carried the banner for the former group. At one of the bargaining conferences with management she presented a grievance (an illustration that she knew who was authorized by management to entertain grievances) that in her department men were permitted to smoke but women were not. Respondent acceded to her request that the privilege be accorded to women and designated her to present the glad tidings to her fellow women employees. She was thus honored by management with the thought that it would enhance her popularity with the other women and allay the dissension existing in her department. Unfortunately it had the opposite effect. Ford posted a notice concerning this smoking privilege which she had won from management, and the battle of words and epithets between the smokers and non-smokers was greatly accelerated. Ford and another woman agreed to go outside and settle their differences in a fist fight. They were warned by Larr that such a fight would mean the immediate discharge of both.

The situation became so tense that on April 10, 1944, a Mrs. Martin and Mrs. Cozad asked foreman Larr for their release. Larr suggested that they go to the office and talk to Strecker. This they did, and in the conversation told him that they had tolerated Ford as long as they could and they were requesting their release. Strecker pointed out to them the critical scarcity of labor, the importance of the work in which they were engaged and urged them not to quit. He promised them that he would have a talk with Ford for the purpose of attempting an adjustment of the existing controversies so that they all might continue as employees.

This brings us to the events immediately preceding her discharge. Strecker asked Larr to send Ford to his office. Larr transmitted this message to Ford, who told him that she knew that Martin did not care for her and felt she had been to Strecker's office to talk about her, and that she would not go to Strecker's office unless accompanied by Martin, Cozad and Hurst, the president of the local union. Thereupon, Ford called Strecker, told him she could not come alone and repeated what she had told Larr as to the conditions on which she would come. Strecker informed her that he wanted her to come alone. She refused to do so.

The company had a long established and well known rule that an employee who refused to comply with the direction of a supervisory employee was subject to discharge, which rule had been enforced in the past. Strecker therefore had two alternatives, either to discharge Ford for insubordination or to ignore a flagrant violation of this rule. Strecker did not discharge her at this time but reported the incident to Usner, who suggested that Strecker talk with respondent's attorney, and this he did. He explained to the attorney that the respondent did not wish to discharge Ford because the company did not want to lose an employee, that she was a union official and that he had worked very agreeably with her during the bar-

gaining conferences. The attorney suggested that the matter be permitted to rest until the following morning so that Ford might have an opportunity to think it over and perhaps she would change her mind. On the next morning (April 11), Larr at Strecker's request again asked Ford to go to Strecker's office. In the meantime she had consulted with Hurst, the union president, who advised her that instead of demanding that she be accompanied by Martin, Cozad and himself, she refuse to go unless accompanied by the entire union bargaining committee. She then called Strecker by telephone and told him she would not come without the entire committee, and Strecker told her that unless she came to his office alone as directed she would be dismissed. This she refused to do and she was accordingly discharged for insubordination.

The Board in its brief states: "As the Board has pointed out the legality of Ford's dismissal turns upon the issue whether or not she was within her statutory rights in insisting upon the presence of the Union committee when Strecker ordered her to report to his office alone." A decision of this issue favorable to the Board would mean that any employee could with impunity refuse to comply with a direction by management and in effect abrogate a rule such as the one here involved. Assuming that an employee has a right to be represented by the union in the discussion or presentation of a labor grievance with an employer, such a right does not exist in the instant case. This is so, in our view of the matter, because there is no basis for the contention that such a grievance was involved. Certainly Ford had no grievance which she was desirous of taking up with respondent, and there is no evidence that respondent had a grievance against her. The record shows without question that Strecker's only purpose in requesting an interview with her was a final attempt to iron out the friction which existed among the women in Ford's department, as he had promised Martin and Cozad he would do. The fact is that respondent was tolerant to an unusual degree with Ford and other employees

of her department. It had no desire to discharge anybody. It was engaged in war work, labor was scarce and it needed the services of all. It was faced, however, with a difficult proposition. The time had come when the friction had to be eliminated or Martin and Cozad would quit. To prevent this action by these two employees, Strecker sought a conference with Ford.

Even under the Board's theory, respondent would have been justified in discharging Ford after her first refusal to respond to Strecker's request. As she learned that evening from the union's president, she had no right to require that Martin and Cozad accompany her to Strecker's office. The Board professes to see some sinister purpose, however, in the fact that the matter was taken up with respondent's attorney and action, upon his advice, held in abeyance until the following morning. In our view, this incident is devoid of any such aspect, and in fact it strengthens the good faith position of respondent and its desire to avoid if possible the discharge of Ford.

■ In our judgment, there is no basis for an inference that respondent discharged Ford because she was a union official or to infringe upon any of her rights as a member or official of the union, and certainly there is no basis for an inference that it was done for the purpose of or that it resulted in any restraint, intimidation or coercion against Ford or anyone else. The Board's finding in this respect is without substantial support.

Both Ford and other union officials recognized that her discharge was for the reason assigned by respondent, that is, her insubordination. While such recognition is not conclusive, it furnishes strong support for respondent's position, and at the same time seriously impairs whatever basis the Board otherwise had for its decision. After Ford had been informed of her discharge, she demanded her dismissal papers. A Termination of Employment statement was given her, upon which insubordination was stated as the sole reason for her discharge. The statement also in-

cluded, "The foregoing is the reason for the termination of my employment." Ford signed this statement without protest. It is difficult to believe that a woman of Ford's intelligence would sign such a statement if she had any reason to think her discharge was for any cause other than that stated.

Respondent's willingness to recognize and deal with ·the union and its fair attitude toward Ford were further evidenced by another incident which occurred subsequent to Ford's discharge. On the same day (April 11), Strecker had a conference with the entire membership of the bargaining committee except Ford, at which meeting he explained the reason for her discharge. On April 14, a meeting was had between respondent's officials and the committee, in which the latter requested that Ford be reinstated, and an agreement was reached by which she was to be reinstated in a department other than that in which she had been employed. This agreement was reduced to writing and contained the following statement: "The UAW-CIO Local No. 531 concedes that the company was entirely within its right in discharging her." This agreement was signed by respondent's president and by the president of the local union and four members of its bargaining committee. True, the officials of the union signed "subject to approval of the members," and at a union meeting subsequently held the agreement was repudiated. We need not discuss the effect of this agreement. We merely mention it for the purpose of showing that the officials of the local union must have recognized that Ford was discharged because òf insubordination and not for some other reason.

Holding as we do that there is no substantial support for the Board's finding that Ford was discriminatorily discharged, there is no reason to discuss or decide the contentions made regarding respondent's offer of reinstatement. In other words, we hold that her discharge was for a lawful and valid reason, and this being so respondent was under no obligation to reinstate her to her former position or for that matter to any position.

We therefore conclude that the Board's order is invalid and that its petition for a decree of enforcement must be and is hereby denied.