## NATIONAL LABOR RELATIONS BOARD v. REYNOLDS INTERNATIONAL PEN CO.

### No. 9287.

Circuit Court of Appeals, Seventh Circuit.

June 24, 1947.

---

Gerhard P. Van Arkel, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, William R. Consedine and Morris P. Glushien, Associate Gen. Counsels, and Dominick L. Manoli and Ben Grodsky, all of Washington, D. C., for petitioner.

Claude A. Roth, Harry Schulman and H. R. Begley, all of Chicago, Ill. (Gottlieb, Schwartz & Friedman, of Chicago, Ill., of counsel), for respondent.

Before SPARKS, MAJOR and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This case is here upon petition of National Labor Relations Board, pursuant to Sec. 10 (e) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., for enforcement of its order issued against respondent on August 30, 1946, following the usual proceedings under Sec. 10 of the Act. The Board's order is based on findings that respondent (1) in violation of Sec. 8(1) of the Act interfered with, restrained and coerced its employees by various acts and statements calculated to thwart their efforts at self-organization, and (2) in violation of Sec. 8(3) and (1), discriminatorily discharged employees Bullard and Lingle because of their leadership and affiliation with and activities on behalf of the union (Fountain Pen and Pencil Makers' Union, Local 13,318, A. F. of L.).

The Board's order requires respondent to cease and desist from its unfair labor practices, to reinstate with back pay the employees discriminatorily discharged and to post appropriate notices.

The contested issues rise in the main from respondent's contention that the Board's findings are not supported by substantial evidence, and in some instances that the findings even though thus supported are insufficient as a basis for the Board's order.

The oral argument before this court, as well as a study of the briefs submitted by the respective parties, raises a doubt as to the propriety of the Board's order, which has caused us to read all the testimony before the Board as shown in the appendix to the briefs of both the petitioner and the respondent. We have done this not for the purpose of weighing the evidence but to satisfy our own minds as to whether it furnishes substantial support for the findings and the order sought to be enforced.

The Board's findings are predicated almost entirely upon statements found to have been made by respondent's supervisory employees.[1] The practices complained of are narrowly limited as to time and those affected. They all occurred between January 5 and January 21, 1946, and the employees involved were about 22 women employed on the night shift in respondent's ball-point department. At that time respondent employed about 500 persons, almost equally divided between day and night shifts, 95% of whom were women. The record is not clear as to whether respondent's employees generally were organized or represented by a union. The proof shows conclusively, however, and there is no contention to the contrary, that the employees involved in this proceeding were not members of a union and that no effort had been made at organization prior to the happening of the events in controversy. It is also pertinent to note that there is no proof and no contention that respondent prior to the happening of the events connected with the instant proceeding manifested any hostility toward unions or was opposed to or interfered with the right of its employees to organize. In other words, no unfavorable background is shown, a factor so frequently relied upon to characterize the practices complained of.

---

[1] It was stipulated that the following persons are such employees: Milton Reynolds, President; Julian Levi, Vice President in charge of production; Siegfried H. Fleishhacker, General Manager; Joseph E. Heil, Assistant General Manager; Nate Feinberg, Plant Superintendent, night shift; and Robert Andre, Foreman of ball-point room. Another supervisory employee to keep in mind is Earl Kaiser who at one time was a Foreman and who was succeeded by Andre.

While there are numerous incidents relied upon by the Board, we think its findings as to two major events are largely determinative of the validity of its order, especially as it relates to Sec. 8(1) of the Act. These two findings relate to a walkout on January 5, 1946, and a speech made by Reynolds to all of respondent's employees on January 12, 1946.

As to the walkout, we quote from the Board's brief: "On January 5, 1946, Foreman Kaiser, of the night shift in respondent's ball-point department, informed his subordinates that he was being demoted. This announcement stirred up considerable unrest and discussion among the employees, particularly because of earlier rumors of impending wage reductions which had been current in the department. The employees feared that Kaiser's reported demotion presaged a decrease in their own rates of pay. After discussion, they authorized Employee Helen Fisher to ask General Manager Fleishhacker to talk to them and give a definite explanation of the situation. Fleishhacker was not present at the plant and the employees, upon the suggestion of Employee Margaret Bullard, decided to stage a walk-out. All but one of them punched out their time cards and left the plant."

The leaders in the walkout movement were employees Lingle and Bullard (subsequently discharged) and Fisher. After leaving the plant the employees gathered at a nearby cafe and attempted unsuccessfully to get in contact with Fleishhacker. While at the cafe they decided, at the suggestion of Kaiser, to seek the aid of a labor organization. On the following morning, January 6, Fisher telephoned Fleishhacker and asked him whether "she had a job." Fleishhacker answered that if she reapplied for employment he would give her a job but stated that "Marge Bullard and her girl friend [by whom the Board found he meant Elsie Lingle] were the instigators of the girls walking out, and they were going to be fired." From this finding the Board concludes: "It is self-evident that for the respondent thus to single out two of the leaders of the employees' legitimate concerted activities, and to threaten them with discharge in reprisal for such leadership, was calculated to interfere with, restrain, and coerce the employees in their exercise of the rights protected by Section 7 of the Act."

 The validity of this conclusion can be sustained only if the employees who participated in the walkout were engaged in "legitimate concerted activities." The Board's conclusion is predicated upon its finding that the walkout was due to an apprehension on the part of the employees that their pay was to be decreased. We think there is no substantial evidence in support of this finding. True, there was some testimony that there had been a rumor among the employees of a wage cut, and certain witnesses obviously as an afterthought and for the purpose of bolstering the Board's case attempted to couple this rumor with the actual reason for the walkout. The proof shows, however, without any room for a contrary view, that the walkout was staged in protest over the demotion of Kaiser who was at that time night foreman.

Foreman Kaiser was not in respondent's employment at the time of the hearing; in fact, he appeared as a representative of the union and was a witness for the Board. In his testimony he makes no mention of any rumor concerning a wage decrease as a reason for the walkout. Subsequent to the walkout Fisher, at the request of the other employees participating in the walkout, contacted officials of the union and arranged for a meeting, which was held on January 7, 1946. Cortese, the president of the union, with whom this meeting was held, was a witness for the Board. He testified that when Fisher sought to arrange for the meeting he asked her the reason for the walkout and that she replied that they thought the foreman was efficient to carry out his duties and that they were sympathizing with him. At the meeting which was held with Cortese on January 7, the employees assigned the same reason. Cortese testified that he told them at the meeting that "the foreman was purely a management prerogative and that they were wrong in walking out in sympathy with their foreman," and that he advised them to go back to work.

We reject the finding as to the cause of the walkout, and it follows that we must also reject the conclusion based thereon, that it was an unfair labor practice to threaten the discharge of Bullard and Lingle. Cf. National Labor Relations Board v. Draper Corp., 4 Cir., 145 F.2d 199, 156 A.L.R. 989. These employees who walked out because they were dissatisfied with the change of a foreman which, as the union leader told them was a prerogative of management, were not protected by the Act. In fact, as they all recognized by making application for reinstatement, they severed their relations as employees and we are of the view that respondent would have committed no unfair labor practice if it had threatened to discharge all of those involved or had refused to reinstate them. The fact that respondent threatened to discharge only Bullard and Lingle, two of the leaders in the walkout, does not alter the situation. Neither does the fact that respondent saw fit to reinstate all of those who had walked out, including Lingle and Bullard, aid the Board's cause. Respondent should not be condemned because of its willingness to overlook their unjustifiable conduct.

█ Moreover, assuming the validity of the Board's finding that the walkout was attributable to rumors of a wage decrease, we still think it was unauthorized. It must be kept in mind that at the time of the walkout no demand had been made upon management concerning wages and no bargaining in reference thereto had been undertaken or suggested. In fact, there was no existing labor dispute or controversy of any character. The so-called justification for the walkout admittedly was based entirely upon rumor. The record further discloses that there was no reasonable basis even for this rumor because on January 3, two days before the walkout, a speech was made by Superintendent Heil to all of respondent's employees, including those here involved, in which he took cognizance of the rumor concerning a wage cut and informed them definitely that there would be no reduction in wages but if anything an increase.

As already noted, Kaiser, much to the disappointment of the employees here involved, was removed as foreman. Respondent appointed as his successor Andre, who boasted of the fact that he was an Army private and proposed to operate the department under strict discipline. The women employees disliked him and the tactics which he pursued. There was much friction in this department and Fisher, Bullard and Lingle frequently complained to Fleishhacker concerning the situation. We shall later make reference to some of the incidents which occurred but at the present it is sufficient to note that little if any of it had any relation to union activities, and certainly none of it can be attributed to respondent's interference with its employees' right to organize. On the night of January 12, Fisher, Bullard and Lingle were in Fleishhacker's office to complain as usual about their foreman, Andre. While they were there an announcement was made requesting all plant employees to assemble for the purpose of hearing an address by President Reynolds who, the record discloses, had just returned from a trip.

This brings us to the second major incident relied upon by the Board, which is the speech made to the employees by Reynolds. As to this speech, the Board found: "Reynolds opened his address by saying that he had heard that there was trouble in the factory, and that he had come back to straighten it out. He went on to say that he had received an offer to locate the factory 'down south,' where he could obtain cheaper labor and be free of labor troubles, and where he himself would prefer to live because of the year-round warm climate; that if he decided to move his plant, he could pack whatever equipment was necessary in 48 hours; but that he did not want to move if the employees wished him to remain. Reynolds asked the employees if they wanted him to stay, whereupon they chorused an answer in the affirmative. In that event, Reynolds continued, he would disregard the invitation to move the plant south. He then announced that he planned to redecorate the plant to make it more attractive; that he intended to install a non-profit cafeteria for the benefit of the employees; that he had just returned from a trip to New York,

with his pockets bulging with orders; that the rumors about wage decreases were false; and that if anything, there would be an increase in pay for his employees."

The Board concludes that the remarks thus made constituted "an oblique but unmistakable threat that he would move the respondent's plant to the south, thus depriving the employees of their jobs, if the union activity continued," although admitting that the speech contained "no explicit reference to the union and its activities." This conclusion is reached by inferring that the "trouble in the factory" referred to by Reynolds adverted "to the organizational campaign then being carried on by the union among the respondent's employees, and that the employees so must have understood the reference." The Board further concludes that the "intended and inevitable effect of respondent's speech upon his listeners was to convey to them the idea that if the 'trouble' in the plant, i.e., the union activities, did not cease, he would move the plant elsewhere, but if they did cease, the respondent would reward the employees with the benefits mentioned."

■ Thus the Board indulges in the highly speculative inference that Reynolds' speech referred to union activities, and utilizing this inference as a springboard, indulges in the further dubious inference that it constituted a threat directed at the employees' right to organize. Certainly this speech standing alone does not lend itself to such an interpretation. In the first place, Reynolds had just returned from a trip and there is nothing in the record to show that he knew anything about the effort then being made by the employees to organize. In the second place, it had only been a week since the employees here involved had staged an unauthorized walkout in protest of Kaiser's removal as foreman, and in the meantime there had been constant and continuous trouble because of the contention on the part of the employees relative to Andre's overbearing disposition and treatment. We think there is no reasonable basis for an inference that Reynolds' speech was directed at the union or any trouble occasioned thereby. In fact, the circumstances dispel such an inference.

The Board apparently has some doubt of its appraisement of Reynolds' speech, as is evidenced by the following finding: "If there were any ambiguity in Reynolds' speech, that ambiguity was dispelled by General Manager Fleishhacker immediately after the speech was delivered, when in his office he declared to Bullard, Fisher and Lingle that the 'unionism' must stop." As already noted, Bullard, Fisher and Lingle were in Fleishhacker's office prior to Reynolds' speech for the purpose, as was oftentimes the case, of making complaint with reference to Andre. After Reynolds had concluded his speech they returned to Fleishhacker's office for the purpose, as stated in the Board's brief, "to take up with him their complaint against Andre." The testimony regarding this conversation is too lengthy to detail. It covered a broad field. Fleishhacker appears to have been in a talkative mood and on quite friendly terms with Fisher, Bullard and Lingle. He told them in the conversation concerning his life, how he started in business in Europe, and stressed the advantages to be found in this country. During the conversation, so the three women testified, he stated, "I have lived under Hitlerism and I have lived under Americanism, and I have been under laborism," and "you know out of the three isms the only one that is any good is Americanism, I am telling you, this unionism has to stop. I would never get mixed up in any labor movement." Fleishhacker denied making any statement concerning unionism, but the Board found that it was made and we accept it. How this statement by Fleishhacker dispels the ambiguity which the Board thinks might exist in Reynolds' speech, we are unable to discern. Neither do we agree with the Board's theorizing that Fleishhacker's speech can be used to dispel the ambiguity in Reynolds' speech and that Reynolds' speech can be used to show the coercive effect of Fleishhacker's statement. The statement of the latter made under the attending circumstances was clearly an expression of his own opinion and there is not the slightest reason to think that it was for the purpose of or that it had any coercive or restraining effect upon the employees to whom it was made.

We might send this case back to the Board for a reappraisal of the situation in view of our refusal to accept the two major findings which we have discussed; however, the Board relies upon a number of minor incidents which it emphasizes as showing a "concerted pattern of hostility" on the part of the respondent toward the organizational activities of its employees. We shall, therefore, consider such incidents.

On January 7, as already noted, the employees in the point room met with the union representatives. At this meeting they joined the union and took with them application cards to be used in soliciting membership among the rest of the employees in the plant. Fisher, Bullard and Lingle were designated as the temporary organizing committee. On the same date, these employees reported for work on the evening shift and were directed to meet in Fleishhacker's office where Day Superintendent Heil was also present. Fleishhacker, referring to the walkout, stated that he was disappointed in the way they had acted and that they should have contacted him before they did anything. According to a Board finding, Heil remarked, "It looks like this place is pretty well organized. Somebody here knows a lot about wildcat strikes." He further stated, directing his remarks at Bullard and Lingle, "You two worked at Dodge. You should know a lot about strikes." Fleishhacker then directed that Bullard and Lingle leave the room, to which they and the other employees objected. Thereupon, Fleishhacker announced that all of the employees, including Bullard and Lingle, could return to their jobs.

■ We are unable to discern how any unfavorable inference can properly be drawn from what was said at this meeting. True, it appears that Heil labeled the walkout as a wildcat strike. If that appellation means an unauthorized walkout, as we suppose it does, he had it labeled correctly. As we have already shown, we think respondent would have been justified in refusing to reinstate all those who had participated in such walkout, including Bullard and Lingle. That being the situation, we see nothing wrong with Fleishhacker's direction that "Bullard and Lingle leave the room." It shows only a recognition that they were leaders in the illegal walkout, and the fact that they were permitted to return to work shows that they were not even penalized for their unauthorized activity.

As already noted, the walkout of January 5 was a protest against the appointment of Andre as night foreman in place of Kaiser. His appointment accentuated the troubles which had theretofore existed in this department. Fisher, Lingle and Bullard were leaders of the employees and they on numerous occasions complained to Fleishhacker concerning the treatment they were receiving at the hands of Andre. Fleishhacker evidently listened to their complaints with patience and promised to get rid of Andre or have him transferred to a different department, and on January 21 Andre was discharged. It is highly significant to note, however, that of the numerous complaints made to Fleishhacker concerning Andre none was concerned with or related to any acts or statements by Andre concerning the union or the employees' right to organize.

■ The Board's findings include three statements made by or incidents participated in by Andre. On the night of January 7, after the employees had returned to work, Fisher placed some of her union membership cards on the table next to her machine, evidently so they could be seen by Andre. These cards had printed on them "Eversharp, Inc.," which had been crossed out in ink, and the words "Reynolds Pen" substituted. (It appears that these cards had been used by employees of Eversharp in making application for membership in the union.) Andre looked at these cards and stated to Fisher, "If you join that, all you are helping is Eversharp." He also stated to Bullard that he was aware of the fact that "they were trying to get a union in and everything (they) did was only helping our competitor Eversharp." On a later date, when Fisher told Andre that she was leaving, the latter stated that it was "bad business for a woman to get mixed up in a labor movement." We think these statements by Andre were nothing more than

an expression of his personal opinion and add nothing to the Board's case. National Labor Relations Board v. Ross Gear & Tool Co., 7 Cir., 158 F.2d 607; National Labor Relations Board v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486, 495; Jacksonville Paper Co. v. National Labor Relations Board, 5 Cir., 137 F.2d 148, 152.

The third incident involving Andre is narrated in the Board's brief as follows: "Meanwhile, Andre had persisted in his harsh conduct towards the employees working under his supervision. During the night shift on Saturday, January 12, Fisher asked Andre to call Fleishhacker to the ball-point department to hear the girls' complaints. When Andre refused to comply with Fisher's request, an argument arose, and several of the other employees approached the spot where Fisher and Andre were standing. Andre ordered the girls who sided with Fisher to step to one side and the others to return to work. When the employees started to move towards Fisher, Andre forcibly pushed two of them away, telling one of them that she was too young to belong to a union. Lingle remonstrated with him and stated that if the employee was old enough to work, she was old enough to join the Union and that they had already signed her up."

He also stated to Bullard, according to the finding, "You get the hell out of here, you son of a ———. You are the cause of it all." Fisher, Bullard and Lingle, accompanied by two other employees, then went to Fleishhacker's office to complain. The Board treats this episode as one growing out of union activities and respondent's desire through Andre to chastise the employees because of their participation therein. We think the Board's reasoning is baseless, as is shown by the testimony of Fisher, Bullard and Lingle concerning the complaint they made to Fleishhacker immediately after the occurrence. Fisher testified that she asked Fleishhacker "if I had joined the army when I came to work there. What right has Andre got to tell me he is going to do things back there the way they do it in the army? * * * * I told him about Andre pushing the girls around and myself in particular, how he

shoved me around, and telling us that he was the boss back there, and telling us that we had to do it this way, and changing everything, and confusing the girls so that they didn't know whether they were doing it right or wrong." Bullard testified concerning the complaint made to Fleishhacker: "She [Fisher] told Mr. Fleishhacker about Andre saying that we will do it the Army way and 'You go outside and talk to the boss,' and she said that if she wanted to be—if she had wanted to be in the Army she would have joined up, that she didn't have to take that from anyone, and I told Mr. Fleishhacker, I said, 'He is not going to push me around like that.' I said, 'I should clap my heels to a private first class.' I said, 'No, when you are in the Army you don't even clap your heels to a private first class.' "

■ Lingle's testimony concerning the complaint made to Fleishhacker on this occasion was to the same effect. The importance of this testimony is that these three employees, with this occurrence fresh in their minds, went directly to the manager to complain and not a word was uttered concerning Andre's anti-union activities or anything that he had done or said inimical to or in disparagement of their right to join or become members of a union. It is evident that no such thought entered their minds at the time, and the theory that Andre's conduct was relevant to an unfair labor practice was conceived at a much later date. Assuming that Andre was as tough and unreasonable as charged, we fail to see how his conduct proves or tends to prove an unfair labor practice. We do not understand that the Labor Act protects employees from the abusive and arrogant conduct of a foreman, unless such conduct amounts to an interference, restraint or coercion of the rights protected by the Act. In the instant situation, there was not, in our judgment, the slightest connection between Andre's conduct and such rights. Such, in effect, was admitted at the hearing by the Board's counsel, as is shown by the following question and answer: "Trial Examiner Greenberg: There has been some testimony of a generally over-bearing type of conduct on the part of Mr.

Andre towards his subordinate employees generally. Does the Board contend that that general over-bearing conduct constituted an unfair labor practice in any. way?

"Mr. Salvaty: No."

The Board also made findings concerning statements made by Fleishhacker to Fisher. On January 10, Fisher notified Fleishhacker that she was quitting and requested that her check be sent to her home. In' response to his inquiry as to why she was quitting, she stated, "I didn't feel that I wanted to be responsible for all the girls, that I had my work at home to do." Fisher was considered a valuable employee and Fleishhacker was anxious to have her return. According to the finding, Fleishhacker said to her, "What do you want to quit for? If the girls all lean on you to lead them you know you could make yourself a pretty nice position with the company. We need a girl like you for lead lady." She replied that she was not interested. He asked her if he could come over to her home and see her and she replied, "No. My husband doesn't want me to be mixed up in any of this labor movement, you know, the union business." At his suggestion she then agreed to meet him at a point near her home. As agreed, she met him and the two had a long conversation while in Fleishhacker's car. She testified and the Board found that during the conversation Fleishhacker inquired how many had joined the union and that he stated that he and Mr. Reynolds "did not want a union in the plant and that they would fight it all the way." He again told her that "he wouldn't like to see me leave and that I should come back to the factory." She told him that the trouble was due "to Andre picking on the girls and pushing them around, that I was not going to be aggravated with the girls, that was the reason why I didn't want to be in there any more." Thereupon Fisher agreed to return to her job when Fleishhacker promised to get a new foreman in the place of Andre.

 Fleishhacker positively denied making the statement that he and Reynolds were opposed to a union and would fight it all the way. However, assuming it was made, as found, we think it is of little consequence in view of the circumstances.

Fisher had terminated her employment and certainly it could have had no coercive effect upon her. In fact, after the statement was made and after she had apprised Fleishhacker of her membership in the union, she agreed to return to her job upon his promise to obtain a new foreman. This is further proof that the friction between respondent and its employees revolved around the conduct of Andre and not union activities. Fisher returned to work but by the night of January 12 she again decided to quit. She informed her fellow employees that she would get herself "a different job where (she) didn't have to listen to the troubles there." She punched out her card and left the plant. The next morning Fleishhacker telephoned her at her home and again urged her to reconsider her decision to quit. On January 14, she returned to the plant and had a conversation with Fleishhacker, during which the Board found that he offered her a pair of shoes and some nylon stockings. Fisher asked, "What is this for? I am not going to be no stooge for anybody." Fleishhacker replied, "I don't expect you to be a stooge, but as long as the girls will listen to you, and you can lead them, we need a girl back there to keep things in order." Fleishhacker denied this conversation but, as is typical throughout this case, the Board gave full credit to everything and anything testified to by its witnesses and refused to give any credence to witnesses for the respondent. Based on the finding, the Board's theory appears to be that Fleishhacker attempted to bribe Fisher into deserting the cause of the union and joining the side of management. We think no such inference can properly be made. The finding discloses that the stooge specter was raised by Fisher and that upon Fleishhacker's denial of such a purpose she again agreed to return to her job. It seems more reasonable to think that Fleishhacker was attempting in good faith to eliminate the existing troubles and regarded Fisher as capable of rendering effective service to that end. Fisher agreed to and did return to work on the January 14 shift, but she worked only a few hours and again quit.

On January 21, 1946, respondent discharged Bullard and Lingle, which the

Board found to be discriminatory, in violation of 8(3) of the Act. At the same time Evelyn O'Leary, another employee, and foreman Andre were discharged.

At this point another finding must be noted relative to a speech made by night superintendent Feinberg during the night shift of January 22, 1946. The finding recites: "Feinberg opened by saying that he understood there was a union organizing campaign in progress among the respondent's employees, and that his personal advice to the girls was not to join the Union. He proceeded to say that Mr. Reynolds had addressed the employees before, and that the employees knew 'how things stood, that Mr. Reynolds would close his doors if the Union ever got in.'"

That Feinberg made a speech to the night employees, including those of the ball-point department, is not in dispute. The finding is based entirely upon the testimony of one witness, Nellie Knie. On the other hand, five witnesses testified that Feinberg stated that he was making the speech on his own authority and that the employees could join or not join the union as they saw fit, and four of these witnesses specifically denied that Feinberg had said "that Mr. Reynolds would close his doors if the Union ever got in." The Examiner in a voluminous footnote gives his reasons for crediting the testimony of one and rejecting the testimony of five witnesses. His reasoning is far from convincing. A reading of the testimony of these witnesses furnishes no clue as to why their testimony should be cast aside.

■ It is also significant that of the many employees who heard Feinberg's speech the Board, so we must assume, was not able to find a single witness who would corroborate Knie's testimony. Furthermore, the Examiner indulged in the practice of always giving credit to a witness who testified favorably to the Board's charge and discrediting those who testified unfavorably. This practice was followed to such an extent as to cast a serious doubt upon the impartiality of the Examiner as a trier of the facts. Considering all the testimony concerning Feinberg's speech and the attending circumstances, we are of the view that the finding under discussion is not supported by substantial evidence. "'Substantial evidence' is more than a mere scintilla, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 208, 83 L.Ed. 126.

■ In the final result, however, it makes little difference whether this finding is accepted or not. According to all the testimony, Feinberg expressly stated at the beginning of his speech that he was making it on his own authority and not that of Reynolds. Furthermore, his speech as epitomized in the Board's finding discloses that he was expressing his personal views and not those of management.

We conclude, therefore, that the Board's findings with reference to a violation of Sec. 8(1) of the Act are not substantially supported. Much of what we have heretofore discussed is also pertinent to the Board's findings with reference to the discriminatory discharges of Lingle and Bullard in violation of Sec. 8(3) of the Act. The Board in its brief states: "As already noted both of them had incurred respondent's antipathy because of their participation in the stoppage of work on January 5 and the role they played in the organizational activities conducted by the union." The first part of this statement may be true but we think there is not the slightest basis for the second part. We need not reiterate what we have said concerning the walk-out of January 5. It is only natural to think that respondent's management was aggravated at this unauthorized conduct of which Bullard and Lingle were two of the leaders. Respondent, however, overlooked their unauthorized conduct and reinstated them to their positions. From that time until the date of their discharge (only 16 days) there was constant trouble and turmoil in this department. Quarreling and bickering were the order of the day. It amounted to a personal feud between Andre, the foreman, on the one hand and certain employees on the other, of which Lingle and Bullard were invariably in the forefront. It is difficult to say which side

was more responsible for the trouble which beset this department but it is apparent that neither made any attempt to get along with the other.

The highly significant fact, about which there can be no controversy, is that the trouble and the numerous complaints resulting therefrom had nothing to do with unionism or the right of the employees to organize. This was so from the time of the unauthorized walkout on January 5, which admittedly had no connection with unionism or organizational activities, until January 21, when these two employees were discharged. There is evidence that Bullard and Lingle were in some respects inefficient, that they were non-cooperative and were disliked by numerous of their fellow employees. Production in the department lagged. What was respondent to do? It did what we think it had a right to do in its managerial capacity, that is, it got rid of those whom it regarded as responsible for the intolerable situation. In doing so, it discharged not only Lingle and Bullard but also its foreman, Andre. According to the Board's reasoning, Bullard and Lingle were discharged because of their union activities and at the same time Andre was discharged because he, on behalf of respondent, had carried on its anti-union campaign. Such reasoning does not make sense. We think the evidence shows conclusively that they were all discharged for the purpose of restoring order and peace in a department which had become engulfed in chaos and disorder.

The Board also indulges in an unfavorable inference from the fact that O'Leary who was discharged at the same time as Bullard and Lingle was subsequently reinstated, while they were refused reinstatement. The reinstatement of O'Leary is adequately explained. O'Leary's husband pleaded with Fleishhacker to reinstate her because his prolonged illness had seriously crippled the family finances and her income was badly needed to sustain the family. More than that, O'Leary was a member of the union and the fact that she was reinstated does not show that respondent discriminated against Bullard and Lingle because of its refusal to reinstate them. If the circumstance has any relevancy, it is that respondent was not opposed to unionism, but that it was unwilling to tolerate longer noncooperative employees, whether or not they were members of the union. In this same connection, it is pertinent to note that Fisher, who was just as active in the union as either Lingle or Bullard, and perhaps more so, was on two different occasions after she had voluntarily quit persuaded by respondent to return to work. We have already noted and it is pertinent to repeat that each time Fisher quit it was because she was tired of listening to the troubles which were prevalent in the department. At no time did she make any complaint to management because of any unfair labor practice nor did she quit for such reason.

The Board argues the discriminatory nature of these discharges as though the burden was upon respondent to exonerate itself of the charges made against it. The burden, however, was upon the Board to prove affirmatively and by substantial evidence that Bullard and Lingle were discharged because of union membership and activities and for the purpose of discouraging membership in the union. Western Cartridge Co. v. N. L. R. B., 7 Cir., 139 F.2d 855, 858; N. L. R. B. v. Vincennes Steel Corp., 7 Cir., 117 F.2d 169, 173; Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624, 632. We think the Board failed to carry its burden in this respect.

The petition of the Board for the enforcement of its order is denied.