220 F.2d 126
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
WAGNER IRON WORKS AND BRIDGE, STRUCTURAL & ORNAMENTAL IRON WORKERS SHOPMEN'S LOCAL 471 (AFL), Respondents.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 11121.
 No. 11141.
 United States Court of Appeals, Seventh Circuit.
 March 7, 1955.
 Rehearing Denied April 5, 1955.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED David P. Findling, Associate Gen. Counsel, Maurice Alexandre, Atty., George J. Bott, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Bernard Dunau, Atty., N. L. R. B., Washington, D. C., for N. L. R. B.
 Albert J. Goldberg, Milwaukee, Wis., for Bridge, Structural & Ornamental Iron Workers Shopmen's Local 471 (AFL).
 Morris Karon, Milwaukee, Wis., for Wagner Iron Works.
 Max Raskin, Milwaukee, Wis., for International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, CIO.
 Before LINDLEY, SWAIM and SCHNACKENBERG, Circuit Judges.
 LINDLEY, Circuit Judge.
 
 
 1
 In No. 11121 National Labor Relations Board petitions for enforcement of its order restraining respondents, Wagner Iron Works and Structural & Ornamental Iron Workers Shopmen's Local 471, AFL, from further commission of certain allegedly unfair labor practices proscribed by the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., and requiring of each certain affirmative action (109 NLRB 445). In No. 11141, International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, CIO, seeks to set aside that part of the same order dismissing the portion of the complaint which charged that the Wagner Company had wrongfully discharged certain named employees. Petitioner in No. 11141 was the charging party in all proceedings before the Board which are here for review. Two groups not parties to this cause were eventually active in the matters involved, namely, the Temporary Committee, which came into being at the Wagner plant as an interim agent of its employees, and its successor, the Employees' Independent Union. We shall refer to the parties as the Board, the Company, AFL, CIO, the Temporary Committee and the Independent, respectively.
 
 
 2
 For some 14 years AFL had represented the Company's employees as bargaining agent, under an agreement defining their relationship and their several obligations as employer and employees. The last contract, dated July 1, 1950, to continue for one year, was automatically renewable, unless terminated by 60 days' notice. On April 15, 1951, AFL notified the Company that it desired to terminate the agreement as of June 30, and to negotiate a new one.
 
 
 3
 Earlier in the year, certain employees had become dissatisfied with their representation by AFL. They complained that they had never seen the agreement and that union committeemen had been denied opportunity to examine its text and were, therefore, seriously handicapped in the adjustment of grievances. In May a dispute developed as to the interpretation adopted by the Company and AFL of the contractual provision governing holiday pay. AFL Committeeman Don McMahon approached and conferred with officials of the rival CIO regarding it. Later other employees, fearing that AFL intended to sign a new agreement with the Company without first submitting it to them, discussed their situation with CIO representatives and requested that union to organize the plant. The prime movers in this venture, employees Steffes and Gould, AFL steward and committeeman, respectively, became active in the CIO membership drive, which began in the latter part of May. To this end, with the consent of their immediate supervisor, these men absented themselves from work on May 24 and 25, to solicit employees to join CIO. On Saturday, May 26, they reported for work, but, after spending an hour and twenty minutes at the plant, sought and obtained leave to take the remainder of the day off. When they reported for work on May 28, they were discharged.
 
 
 4
 On the same day, CIO notified the employer that it represented "an overwhelming majority" of the employees and, on May 31, it filed a petition for certification. On June 6, the Company and AFL consented that an election be held on June 18, and the Company posted a statement of neutrality. A tug of war then ensued between CIO and AFL in their struggle to win the election. Despite its protestation of neutrality, the Company, practically from the outset, sided openly with AFL, championing the cause of that union and attempting to defeat CIO. Thus, Company Vice-President Werner testified that he attempted "to enlist AFL help so they could beat the CIO." Meanwhile, on June 4, Don McMahon and his brother Roy were discharged, and a realignment of the Company's 55 men night shift was effectuated whereby 22 night employees were discharged and 18 transferred to the day shift. Both actions were approved by AFL.
 
 
 5
 On June 14 CIO filed its amended charge before the Board that the company had acted discriminatorily in discharging Gould, Steffes, the McMahons and the 22 night shift employees. It also filed a waiver of its right to object to the result of the election, because of the pendency of the charges.
 
 
 6
 AFL organizer Modell testified at the hearing that having become convinced that AFL was in danger of losing the election he asked Vice-President Werner in June to try to "have it held up for a bit". "I said * * * it was my opinion that * * * where an election was agreed to * * * any unfair labor charges would be dropped. He says to me, `That was my opinion too.' * * * `What can I do about it?' I says, `Well, I don't know, but I suggest you do something about it.'" Modell said further that he "was anxious * * * to stop the election", but didn't recall whether he suggested that the employer withdraw its consent. Werner testified that he talked to an AFL official, probably Modell, between the 6th and 15th of June, concerning the possibility of AFL winning the election but could not recall what was said. At any rate, on June 15, the Company withdrew its consent to the election. Werner testified that he called the Board's regional office and explained that the Company had consented to the election on the mistaken premise that the unfair practice charges had been withdrawn rather than waived merely for the purposes of the election.
 
 
 7
 Shortly thereafter, on June 20, the CIO adherents voted to strike and formed a picket line at the plant. AFL promptly notified the strikers that their action was unauthorized and directed them to return to work. On June 22, the Company notified many of the strikers that their employment was terminated, asserting that their action amounted to a breach of the no-strike clause of the contract.
 
 
 8
 On June 26 the Board conducted a representation hearing. That evening the CIO supporters voted to terminate the strike. The walkout ended the next day and the strikers offered to return to work. Some were reinstated; some were not. Three of those reinstated subsequently quit when the Company insisted they fill out new applications and start new, with loss of seniority rights.
 
 
 9
 No further contract negotiations occurred. The Company continued to deal with AFL as bargaining agent under the terms of the 1950 agreement until January 1952, when the Temporary Committee was established as interim bargaining agent. In February or early March 1952, at a meeting called by the Temporary Committee, the employees voted to organize a new union, as a result of which Independent came into being. From then on, until as late as May 13, 1952, the Company dealt with Independent concerning grievances and working conditions.
 
 
 10
 On July 13, 1951, CIO filed further specifications of charges, including a claim of statutory violations on the part of the Company by interfering with the employees' right to choose their own bargaining agent, and another against AFL charging interference with employees in their choice of a bargaining agent. Pursuant to an order consolidating the charges, a complaint was filed on March 11, 1952, averring in substance that: the Company had engaged in unfair labor practices in violation of Section 8(a) (1), (2), and (3) of the Act, 29 U.S.C.A. § 158(a) (1), (2), (3), by: (a) a continuous course of conduct by which it assisted and dominated AFL, and, subsequently, the Temporary Committee; (b) discriminatorily discharging Gould, Steffes, the McMahons, Smejkel and the 22 night shift employees; (c) discriminatorily discharging 66 employees who had participated in the strike and constructively discharging four named employees; and (d) engaging in other specified acts of interference with and coercion of its employees in their right to select a bargaining agent. On April 29, 1952, the trial Examiner permitted an amendment adding the Independent as a respondent and averring that the Company had unlawfully assisted and dominated it. The complaint further charged that AFL had engaged in unfair labor practices in violation of § 8(b) (1) (A) and (2), 29 U.S.C.A. § 158(b) (1) (A), (2), by: (a) attempting to cause the Company to discharge discriminatorily Don and Roy McMahon, and (b) pursuing a course of conduct tending to interfere with and coerce employees in their choice of bargaining agent.
 
 
 11
 On November 6, 1952, the examiner filed his report suggesting an order sustaining the complaint except as to the charge that the Company had wrongfully discharged the ten men mentioned in CIO's petition in Cause No. 11141. On April 28, 1953, the Board entered its decision adopting the examiner's findings and entering an order accordingly. As to the ten employees involved in Cause No. 11141, the Board concluded that the Company discharged one of them, Smejkel, solely because of misconduct, and that there was no evidence in the record that the remaining nine, discharged at the time of the strike, were discharged for CIO participation or that they ever sought or were refused reinstatement.
 
 
 12
 The Company was ordered to reinstate, with back pay, Gould, Steffes, the McMahons, the twenty-two night shift employees, fifty-seven unfair labor practice strikers and three men which the Board found to have been constructively discharged after their reinstatement following the strike. AFL was ordered, inter alia, to notify the Company that it had no objection to the reinstatement of the McMahons and to make the McMahons whole.
 
 
 13
 
 Validity of the Order Against AFL.
 
 
 
 14
 Although counsel for AFL filed an appearance, no answer or brief was offered and no representative appeared on its behalf on oral argument before us. A question as to the effect of this status having been raised by the Court at the hearing, subsequent to oral argument, on December 9, a letter from counsel was lodged with the Clerk, without objection, advancing the postulate that the position of AFL is the same as that of the Company and that it adopts the brief and argument of the latter. Two theories are advanced for this position, namely, that the rights and duties of the Company and AFL under the collective bargaining agreement of July 1, 1950 are correlative, or, in the alternative, that the liability ex delicto of AFL depends upon the culpability of the Company, and that, a judgment relative to the Company should control disposition as to AFL. These theories, unfortunately, are not applicable. The unfair labor practices charged against the respective respondents do not grow out of interpretation or application of the contract. The only possible question before us relative to the agreement is whether the acts charged may be justified as legitimate action by respondents in the protection of their respective contract rights. Since the acts of the employer and those of AFL were those of separate entities effectuated by the agency of their respective officers and representatives, there can be no correlation or inter-dependence in the separate acts of the two respondents.
 
 
 15
 The tort aspect of AFL's position is equally untenable. The consolidated complaint charged that various activities of the Company and its supervisory personnel were unfair practices. Two separate courses of activity were specified against AFL, namely, coercion of employees by its chief steward and its contribution to the employer's discharge of the McMahons. The Board sustained both charges. The first is in no sense derivative, while the latter is only partly so. The Board found that an officer of the AFL attempted to cause and did cause the Company to discharge the McMahons discriminatorily. Even if we should set aside the finding that the discharge was in fact discriminatory, the finding that AFL caused the discriminatory discharge, being derivative, would fall, but the finding of an attempt would still remain, and it is, of itself, a violation of Section 8(b) (2).
 
 
 16
 A petition for enforcement of an order is a special statutory proceeding in which the Court alone may make the order coercively effective. N. L. R. B. v. Ford Motor Co., 5 Cir., 119 F.2d 326. It is a combination of an appeal from the order and an original proceeding to enforce it. N. L. R. B. v. Kellburn Mfg. Co., Inc., 2 Cir., 149 F.2d 686. In one sense, our function is that of a Court reviewing the record to determine whether the findings are sustained by the evidence; there the burden is on the respondent to show want of substantial support. In another sense, our function is that of exercise of original jurisdiction, to determine whether and to what extent the order should be enforced or set aside. N. L. R. B. v. Kellburn Mfg. Co., Inc., supra. In the latter situation the Board appears as a litigant, who must sustain the burden of showing its right to enforcement, N. L. R. B. v. Ford Motor Co., supra; see Magnolia Petroleum Co. v. N. L. R. B., 5 Cir., 112 F.2d 545, i. e., that the order is supported by the findings and is in compliance with the statute. N. L. R. B. v. Kellburn Mfg. Co., Inc., supra.
 
 
 17
 AFL, having failed to answer the petition or otherwise defend is a party in default. This situation is the same as that in the Kellburn case, supra, in which the employer failed to defend an enforcement proceeding. We agree with the view therein expressed, that the defaulting respondent must be held to have confessed the allegations of the petition, insofar as they relate to the appeal phase of the proceedings, i. e., the substantial evidence question, and that our only function, therefore, is to examine the findings to see whether they support the order and whether the order complies with the statute, issues on which the Board bears the burden of proof. We conclude as a matter of law that the Board has sustained the burden on each issue and that the order is amply supported by the findings of coercion and of the attempt to cause the Company to discharge discriminately the McMahon brothers. Judgment for enforcement will be entered against the AFL.
 
 
 18
 
 Validity of the Order Against the Company.
 
 
 
 19
 Ultimately, whether enforcement is to be decreed depends primarily on whether the findings are supported by substantial evidence "when viewed in the light that the record in its entirety furnishes." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456. The controversy here involves the sufficiency of the evidence to support the findings of fact as to: (a) Acts of discrimination prior to the strike said to violate Section 8(a) (1) and (3); (b) Acts of support and domination of unions as violative of Section 8(a) (2); (c) Acts of interference and restraint of employees in their right to choose a collective bargaining agent as violative of Section 8(a) (1); and (d) Acts of discrimination in employment subsequent to the strike. The Company asserts cause for the action peculiar to each group.
 
 
 20
 
 Discrimination Prior to the Strike.
 
 
 
 21
 Obviously, the Act does not interfere with the employer's right to conduct his business, and, in doing so, to select and discharge his employees. It proscribes the exercise of the right to hire and fire only when it is employed as a discriminatory device. N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893; U. S. Steel Co. v. N. L. R. B., 7 Cir., 196 F.2d 459, 465-466. The Board may not "substitute its judgment for that of the employer as to what is sufficient cause for discharge", N. L. R. B. v. Williamson-Dickie Mfg. Co., 5 Cir., 130 F.2d 260, 264, and discrimination may not be inferred from an employee's mere membership in a union. Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 202 F.2d 613; N. L. R. B. v. William Davies Co., 7 Cir., 135 F.2d 179, 183, certiorari denied, 320 U.S. 770, 64 S.Ct. 82, 88 L.Ed. 460. In every case the burden is on the Board to prove that an employee's discharge resulted from his union activities. Indiana Metal Products Corp. v. N. L. R. B., supra; N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680, 690. We review the pertinent separate findings of the Board with these principles in mind.
 
 
 22
 
 The Discharge of Gould and Steffes.
 
 
 
 23
 Gould and Steffes, who were, as previously noted, leaders in the efforts of the CIO to organize, were discharged when they reported for work on Monday, May 28, 1951, as the Board found, because of their union activity. The Board rejected as a mere pretext the Company's contention that they were discharged because they had reported to work the preceding Saturday while intoxicated.
 
 
 24
 After examination of the records we are unable to say that this finding is not supported by adequate substantial evidence. These men were employed on the night shift, under assistant Superintendent Schnuck and foremen Bartsch and Golner. They testified that they received permission from Schnuck to absent themselves from work for a part of the night of May 23 and for the nights of May 24 and 25. This time they devoted to meetings with CIO officials and solicitation of employees for CIO. Schnuck admitted that he excused them from work on these days. Saturday morning, May 26, the two men spent, for the most part, in nearby taverns soliciting such of the employees as were present, on behalf of CIO. At noon, they reported for work. Shortly later, Gould asked a fellow employee, Barbian, and Foreman Golner to join the CIO. After working about an hour and twenty minutes both Gould and Steffes sought and received permission from Schnuck to take the rest of the day off, during which time they continued their rounds of employee hangouts soliciting adherents for CIO.
 
 
 25
 When they reported the following Monday, May 28, they were discharged. Both testified that they were informed by Schnuck that they were discharged for passing out CIO cards; and the AFL chief steward Handon was called in to confirm the charge. Employee Bestul testified that shortly after the two were discharged, Schnuck saw Bestul talking to Steffes and ordered him off the premises, saying that he was fired. Bestul's testimony as to this conversation follows: "Mr. Schnuck came up to me, and he said * * * `Jake and Johnny were fired for being drunk * * *' I said, `Johnny Gould was helping me * * * and I never knew that that man was drunk. In fact, I did not know that that man had been drinking at all.' To which Mr. Schnuck said, `Oh, yes, he was loaded.' I said, `If he was loaded, why didn't the Company send him home?' Mr. Schnuck said, `Well, I was just going to send him home.' Then he went on to talk about the CIO. He said, `After all Johnny and Jake are radical about the CIO,' and he says, `Furthermore, they cannot switch unions. We had an election here * * * it doesn't do them any good to try to get the CIO in now.'"
 
 
 26
 Employee Don McMahon reported his conversation with Schnuck as follows: "After I punched out Tom asked me if I had heard * * * that Johnny Gould and Jake Steffes were trying to get the CIO in there, and I told him no, * * * and he says, `Well, that's no good, we are making out pretty good with the AFL already. We will have to see if we can't do something about that,' and I agreed with him * * * `we don't want anything like that, all we'll have is a bunch of strikes and stuff on our hands, and we've been coming along pretty well with the AFL * * *'" These conversations were not denied, except that Schnuck testified that he did not recall Bestul telling him that Gould had not been intoxicated and, further, that he discharged the men because of reports that they had been drunk.
 
 
 27
 The evidence as to the men's intoxication was in conflict. Gould and Steffes testified that they spent Saturday morning soliciting for CIO in bars near the plant and that each, during that time, had one or two glasses of beer. Another employee, Ebbinger, testified that he met them at a bar in the morning; that they left about 10:30 and went to Gould's apartment where they discussed the union problem; that he was with them from 9 to about 11:45 A.M., when he left; that he again met the two men at the plant gate at noon and went into the plant with them; that neither was drunk; and that during the time he was with them in the morning, they were not drinking heavily, but had "about one glass" of beer. Employees Bestul, Roy McMahon and Pattenege testified that they had seen Gould and Steffes at work that Saturday and that their demeanor and actions did not indicate that either had been drinking.
 
 
 28
 On the other hand, foremen Bartsch and Golner and employee Manhoff testified that Gould and Steffes were intoxicated when they reported for work on the afternoon in question. Schnuck testified that Bartsch and Manhoff reported to him, between noon and the time when Gould and Steffes left on that day, that the two were drunk. Manhoff said that although Steffes was intoxicated, he reported that fact only to Bartsch sometime the following week. Bartsch testified that Gould was drunk while at work on the day in question, but that he didn't report that fact to anyone that day. Golner testified that on the afternoon in question he had reported to Schnuck that Gould was passing out CIO cards and that he and Steffes were intoxicated. The examiner expressly discredited Golner's testimony on this point. He found it impeached by the fact that Golner admitted that his testimony was in conflict with statements made by him in a pretrial affidavit in which he had stated that on the afternoon in question he had reported to Schnuck that Gould was soliciting for CIO, but had said nothing about them being drunk. Further, it is undisputed that during the time Gould was at work that day, Golner assigned him to help Bestul on a saw, a task which all witnesses agree was hazardous and not safe for anyone under the influence of alcohol.
 
 
 29
 Thus, whether the two men were intoxicated in the afternoon and whether Schnuck had any knowledge of that fact, if true, was largely a question of credence of witnesses. We cannot say on the record as a whole that the finding that they were discharged because of their union activity is not adequately supported by substantial evidence. Two opposing inferences might have been equally reasonable, but we are not justified in ignoring the advantage which the examiner had in judging the witnesses' credibility, N. L. R. B. v. Dinion Coil Co., 2 Cir., 201 F.2d 484, or in displacing the Board's choice between two fairly conflicting views. Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 204 F.2d 529, certiorari denied 346 U.S. 909, 74 S.Ct. 241, 98 L.Ed. 407. Under this record the Board did not unreasonably infer from the circumstances that union activity was the reason for the discharge of the two men. R. R. Donnelley & Sons Co. v. N. L. R. B., 7 Cir., 156 F.2d 416, certiorari denied 329 U.S. 810, 67 S.Ct. 624, 91 L.Ed. 692.
 
 
 30
 
 Discharge of the McMahon Brothers.
 
 
 
 31
 As we have observed, the Board found that Don and Roy McMahon were discriminatorily discharged because of their activities on behalf of CIO. The evidence indicates that Roy was an early adherent to and an active campaigner on behalf of CIO. Don, who had discussed the holiday pay question with CIO representatives, apparently remained loyal to AFL in the representation dispute. Roy's foreman, Krueger, testified that on June 4, he was questioned by Superintendent Dyskow, as to whether he had missed any of his men on the afternoon of May 29. Krueger replied in the negative. Dyskow then said that Roy McMahon had been seen in a tavern that afternoon; that his brother Don had punched Roy's card; that an FBI check had revealed Don's fingerprints on the card. The witness said that he had been questioned also by Vice-President Werner who repeated substantially the statement made by the Superintendent. He replied that he told Werner that he knew Roy had not been absent, because he, Krueger, had made the customary check of Roy's production at the end of the shift, and further, that Werner instructed Dyskow to call in the McMahons and the AFL shop committee, and dismissed Krueger saying, "We won't need you here anymore." According to the undisputed testimony of the McMahons, they were then called into Dyskow's office and discharged in the presence of Werner, Dyskow, President Wagner and the AFL shop committee. The reason then given by Dyskow for the discharge was that Roy had left work about 2:30 P.M. and that Don had punched his brother out at quitting time. Werner was quoted as stating that he had already informed Waldow of the discharge; that the matter should be taken up with AFL and that if he had a man on his committee who was a spy for CIO he would get rid of him. To Don's denial of the spying charge, Werner is quoted as saying that he had loyal men reporting to him and "We know what is going on."
 
 
 32
 Witnesses testified that on the following day, some ten or fifteen employees, including Krueger, Barbian and some of the AFL committeemen, went to Dyskow's office, where each, in turn, reported that Roy had been present on the afternoon in question, and that Dyskow listened to them, without comment, except to state that he had information that Roy had been absent and that Don had punched him out.
 
 
 33
 Neither Werner nor Dyskow testified as to the reasons for the discharge of the McMahons. Werner said, on cross-examination, that he had not procured an FBI check of the time card, and that any statement that he had was false. Assistant-Superintendent Banaszak testified that Roy was absent on the afternoon in question; that he walked past Roy's work station about 2:30 in the afternoon and did not see him at work; that he did not see Roy at his station any time that day, and that he was certain he had made more than one tour of the department during the afternoon. On cross-examination he said that he could not remember the time of any tour except that made at 2:30; that he was sure he made others, because he customarily walked through and checked each section several times in the course of an afternoon; that a man absent from his machine at any particular time might be in the washroom or elsewhere in the building, and that he did not report Roy's absence to anyone prior to Roy's discharge. He testified also that he had seen Don on three occasions punching Roy's time card in the morning; that he had warned Don not to do so and had reported the occurrence to Dyskow, and that the last date when he had seen Don punch Roy's card was May 29. Don admitted that he had made it a practice to punch in the card of the driver of his car pool, while the driver parked the car, but had refrained from so doing after Banaszak's warning. There was also undisputed testimony that the practice was not unique at the plant. Two witnesses testifying to conversations with AFL chief steward Handon, shortly after the discharge, quoted him as stating that he had had the McMahons fired because they were stool-pigeons for CIO and were undermining AFL. Handon denied these conversations or any such admission on his part. This evidence, we think, affords substantial support for the finding of discrimination.
 
 
 34
 The Company contends, however, that the Board's case rests solely on inference, hearsay and self-serving statements; that Banaszak's testimony that Don had in fact punched Roy's card on three occasions proves that cause existed for discharge, and, further, that the claim of the McMahons was never submitted to arbitration. Each argument must fail. The testimony stands uncontradicted as to the nature and content of the conversations had just preceding, during and immediately after the discharge. That the testimony of the McMahons was self-serving goes only to the question of their credibility. We are not justified in saying that their testimony was not worthy of belief. The testimony of Krueger, Barbian and other witnesses that they had told Dyskow on June 5 that Roy had not been absent from work on the afternoon in question was certainly competent as to the conversations the witnesses personally had with Dyskow and as to the fact that some ten to fifteen employees sought out Dyskow to report Roy's presence.
 
 
 35
 Nor can reliance be soundly based on Banaszak's testimony to support unsubstantiality and to prove that these employees were discharged because of the card-punching incidents. For, even if we believed that these events furnished good cause for discharge, on the record, it was not unreasonable for the Board to find that the discharges were in fact motivated by the employees' CIO activities. R. R. Donnelley & Sons Co. v. N. L. R. B., supra; N. L. R. B. v. Chautauqua Hardware Corp., 2 Cir., 208 F.2d 750, 751.
 
 
 36
 Failure of the McMahons, Gould and Steffes, to arbitrate the question of the validity of their discharges can be of no avail to the Company. As the procedures of the contract including arbitration were set up in the agreement with AFL, it is extremely doubtful that that union would object seriously to the discharge of CIO adherents, in the course of an all out battle between two unions for representation. The truth of this statement is supported by the testimony of AFL business agent Waldow that he did not object to the discharges and "was not opposed" to them. Though the Company offered to recognize a CIO grievance committee at one time, the offer was withdrawn before effective negotiation could be had. And, since CIO was not a party to the contract, any basis for effective adjustment of grievances by its committee is at best speculative.
 
 
 37
 Furthermore, arbitration provisions in a bargaining agreement cannot oust the Board's jurisdiction to prevent unfair labor practices. As we said, in N. L. R. B. v. International Union, etc., 7 Cir., 194 F.2d 698, 702, "the Act confers upon the Board exclusive jurisdiction to prevent unfair labor practices * * *. The Board's exclusive function in this field may not be displaced by action before State agencies or by arbitration."
 
 
 38
 
 Discharge of the Twenty-two Night Shift Employees.
 
 
 
 39
 The Board ordered reinstatement of twenty-two night shift employees who, it found, had been discharged in order to discourage CIO activity. The Company offered proof that the discharges and the resulting realignment of the night shift were prompted by a building expansion program designed eventually to eliminate all night operation.
 
 
 40
 After reviewing the evidence, we think it clear that the Board did not sustain the burden of proving that these discharges were discriminatory. The record does not disclose the union affiliation or leanings of any of the discharged employees. It does not support the essential finding that the Company knew of the CIO membership or leanings, real or presumed, of the discharged employees. See N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680. There appears of record only the evidence that these men were discharged during the representation campaign, the testimony of conversations in which Werner was quoted as saying that he had loyal employees reporting to him and knew what was going on, and the testimony of a witness who quoted foreman Wotta as saying that Dyskow had told him, Wotta, that the night work would not be resumed at full force because he didn't want the CIO activity to be resumed.
 
 
 41
 The finding that the discharge of these men was discriminatory cannot be sustained by speculation drawn from the flimsy evidence presented that the Company knew of their CIO activity if any. See N. L. R. B. v. National Paper Co., 5 Cir., 216 F.2d 859, 862-863; N. L. R. B. v. Whitin Machine Works, 1 Cir., 204 F. 2d 883; Tampa Times Co. v. N. L. R. B., 5 Cir., 193 F.2d 582. Unless there is a reasonable basis in the evidence for the finding of knowledge "the employer need not excuse or justify his action." N. L. R. B. v. Whitin Machine Works, supra, 204 F.2d at page 885. See N. L. R. B. v. Reynolds International Pen Co., supra, 162 F.2d at page 690. Accordingly, the Board's finding and order as to the discriminatory discharge of these twenty-two employees must be denied enforcement.
 
 
 42
 
 Support and Domination of Unions.
 
 
 
 43
 Substantial evidence on the record as a whole adequately supports the findings that the Company supported and fostered AFL and supported and dominated the Temporary Committee and the Independent in violation of Section 8(a) (2) of the Act. In addition to the admission by Werner and Dyskow that they favored AFL and worked actively to defeat CIO's drive, it appears that Werner prodded AFL into action to offset the CIO attack; that the Company aided AFL by printing and distributing to its employees inflammatory anti-CIO literature, most of which was distributed by company personnel at the plant gate during working hours on company time; that AFL organizers were granted access to all areas of the shop for organizational purposes, while the same privilege was expressly denied CIO; that AFL chief steward Handon was permitted to solicit dues and support for his union on Company time; that Werner suggested to AFL officials that they employ force to break up a CIO meeting and to break up the picket line, offering in each instance financial support to satisfy any liability which might be incurred for damage to property. The Company withdrew its consent to the election; it continued to recognize and deal with AFL as bargaining agent after the latter's majority status was in dispute, both before, and for a considerable period of time after, expiration of the bargaining agreement. It volunteered aid to AFL in collection of dues, by suggesting institution of a check-off arrangement, a privilege which it had previously denied.
 
 
 44
 In January, 1952, the company suggested to the AFL committee that the employees form an independent union to act as interim bargaining agent and aided in the formation of the Temporary Committee. For example, the plant loudspeaker system was made available to the Committee to announce organizational meetings; the Company newspaper was employed to publicize and support the Committee's activities; notices and propaganda literature were printed by the Company, using the personnel and facilities of its general offices. The Company premises and facilities were made available for meetings and an election to adopt the Temporary Committee, during working hours on Company time.
 
 
 45
 The Employer's hand in the organization of Independent is not quite so obvious. There is, however, undisputed testimony to support the conclusion that Independent was the brain-child of the Company, in collaboration with the AFL committee. We think the finding of its support and domination is amply sustained by the evidence.
 
 
 46
 The Company, objecting to the finding that it supported the AFL, argues first, that such support as the evidence supplies constitutes merely permissible exercise of its statutory guarantee of freedom of speech. The rights of the employer in this respect must be construed in conjunction with its duty to maintain neutrality in a contest between rival unions. We said in N. L. R. B. v. LaSalle Steel Co., 7 Cir., 178 F.2d 829, 835, that Section 8(c) is no more than a restatement of the principles of the First Amendment to the Constitution. See N. L. R. B. v. Kropp Forge Co., 7 Cir., 178 F.2d 822, 823-827, certiorari denied 340 U.S. 810, 71 S.Ct. 36, 95 L.Ed. 595. As we held, to construe Section 8(c) so as to permit, under the guise of free speech, acts which otherwise would be coercive or unlawful "would nullify the guaranty of employees' freedom of action and choice which Section 7 of the Act expressly provides." 178 F.2d at page 829. The free speech provisions cannot extend to such activities as were here committed in furtherance of keeping AFL as bargaining agent, for the Company's actions far exceeded the mere expression of a preference and ignored the requirement that the employer maintain neutrality with respect to contesting unions. See e. g., N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893; N. L. R. B. v. Shedd-Brown Mfg. Co., 7 Cir., 213 F. 2d 163; Harrison Sheet Steel Co. v. N. L. R. B., 7 Cir., 194 F.2d 407, 410; N. L. R. B. v. Kropp Forge Co., 7 Cir., 178 F. 2d 822, 823-827, certiorari denied 340 U.S. 810, 71 S.Ct. 36, 95 L.Ed. 595.
 
 
 47
 The Company's further insistence that this finding is refuted by its express declaration of neutrality is unconvincing, for its action, through Werner and other supervisory personnel, wholly belies the statement, which we must consider in the light of facts which the record as a whole supports, N. L. R. B. v. Laister-Kauffmann Aircraft Corp., 8 Cir., 144 F.2d 9. Mere "lip service to the policy and purposes of the Act is not sufficient." Id., 144 F.2d at page 13. See also Magnolia Petroleum Co. v. N. L. R. B., 5 Cir., 200 F.2d 148, 150.
 
 
 48
 Equally wanting in merit, is the argument that the Company's acts in support of AFL were permissible activity to protect its rights under the contract with that union. Inasmuch as grievance, arbitration and other procedures cannot oust the Board's jurisdiction, N. L. R. B. v. International Union, etc., 7 Cir., 194 F.2d 698, 702, activities within the realm of unfair labor practices can never qualify as contract rights entitled to protection. Indeed there is no contract right which the Company's activities at issue herein were designed to protect, unless the employer is attempting to assert a contract right to maintain AFL as the bargaining agent for its employees. Obviously, such a position is fatally inconsistent with the employees' right to representation by a bargaining agent of their own choice. This part of the order must be enforced.
 
 
 49
 
 Interference, Coercion and Intimidation.
 
 
 
 50
 The Board found, and substantial evidence supports the finding, that during the course of the organizational campaign, the Company's supervisory personnel interrogated employees about their union activities, instructed employees to remove CIO stickers and buttons from their persons and from plant property while they, in some cases, were themselves wearing AFL insignia, that it threatened employees with discharge, added work-loads or other reprisals because of support of the CIO, instituted surveillance of the employees' union activities, offered financial gains to employees in the form of 10 hours' pay for 9 hours' work, offered its employees increased benefits in the form of a profit-sharing plan and wage increases, at a time when the question of representation was pending, and compelled returning strikers to condition their reinstatement upon removal of their CIO buttons, upon refraining from CIO activity and upon forfeiting seniority. The evidence on this phase of the case is not largely in dispute and, even in cases where conflict exists, we cannot say that the Board's findings are not substantially supported by credible evidence.
 
 
 51
 The Company relies, as to the finding of interrogation and surveillance, on its contention that these activities are permissible under the free-speech guaranty. It contends that reasonable interrogation is permissible and that an employer is entitled to institute reasonable surveillance to keep himself informed as to what is going on in his plant. We may accept these contentions as correct statements of the law, assuming that such activities are so conducted as not to be intimidating or coercive, Thus, the Board has recently held that an employer may legally interrogate his employees as to their union membership in order to inform himself as to the validity of a union's claim of majority support. Blue Flash Express, Inc., 109 N.L. R.B. No. 85. However, as the Board said, the object of interrogation must be within the law and an employer acts at his peril, lest his investigation become tainted and coercive when considered in conjunction with other activities which reveal a departure from strict neutrality.
 
 
 52
 We are not here concerned with whether each of the activities found to exist if standing alone, would be coercive. Our language in N. L. R. B. v. Kropp Forge Co., 7 Cir., 178 F.2d at pages 828-829, is pertinent: "It * * * seems clear to us that in considering whether such statements or expressions are protected by Section 8(c) of the Act, they cannot be considered as isolated words cut off from the relevant circumstances and background in which they are spoken. A statement * * * might seem * * * perfectly innocent * * *, including neither a threat nor a promise. But, when the same statement is made by an employer to his employees, and we consider the relation of the parties, the surrounding circumstances, related statements and events and the background of the employer's actions, we may find that the statement is a part of a general pattern which discloses action by the employer so coercive as to entirely destroy his employees' freedom of choice and action. * * * If, when so considered, such statements form a part of a general pattern or course of conduct which constitutes coercion and deprives the employees of their free choice guaranteed by Section 7, such statements must still be considered as a basis for a finding of unfair labor practice." We believe the record before us demonstrates a general pattern and course of conduct on the part of the Company to discourage the employees in their right to choose, beginning with the discharge of Gould and Steffes and continuing until some time after the end of the strike in June 1951 and the apparent defeat of the CIO drive. Although, some findings of unfair practice under this heading, notably that of surveillance, rest almost solely on inference, when considered as a part of that general pattern of conduct, we think the Board was justified in finding the practices coercive.
 
 
 53
 
 Discrimination Subsequent to the Strike.
 
 
 
 54
 Whether the discharge and refusal to reinstate the fifty-seven strikers and the constructive discharge of three others by conditioning their reinstatement upon loss of seniority were discriminatory depends on whether the strike was a protected activity. If it was, the discharges and refusals to reinstate were unlawful. In stamping these discharges unlawful, the Board rejected the Company's defense that the strike was unprotected because it was in violation of the no-strike clause of the AFL contract and in violation of Section 8(d) of the Act, 29 U.S.C.A. § 158(d).
 
 
 55
 Section 13 of the contract established a procedure to settle grievances "involving the meaning, application or interpretation of this agreement." Section 14 provided for arbitration of any dispute "which has not been satisfactorily settled" by employing section 13 procedures, but that "the authority of the arbitrator shall be limited to the interpretation and application of the express terms of this agreement." Section 15 provided that "(A). The Company and the Union agree that the grievance procedure provided herein is adequate to provide a fair and final determination of all grievances that may properly arise under the terms of this agreement, and shall be the sole means of disposing of grievances. It is the desire of the Company and the Union to avoid strikes and work stoppages and lock-outs. (B) The Union agrees that neither it nor its members, individually or collectively, will, during the term of this agreement, cause, permit, approve or take part in any strike * * * except for the refusal of the Company to arbitrate in accordance with Section 14 or * * * to abide by the award of the Arbitrator." (Emphasis supplied.)
 
 
 56
 The Company contends that the word "strike" means any strike for whatever cause. This contention, it seems to us, erroneously assumes that the language of Section 15(B) must be read alone without relation to other provisions of the contract. The "no-strike" clause must be interpreted in the light of other terms of the contract. The agreement covers rates of pay and working conditions, and its remedial provisions do not purport to extend beyond that. Thus, as we have observed, the grievance procedure is expressly designed to settle disputes over the "meaning, application or interpretation of this agreement"; the arbitration provision is expressly limited "to the interpretation and application of the express terms of this agreement"; the policy statement of the parties, which forms a basis for the "no-strike" and "no-lock-out" clauses, is an agreement that such procedures are adequate "to provide a fair determination of all grievances which may properly arise under the terms of this agreement." The no-strike clause which follows immediately after this statement must be construed, as equally restricted, i. e., as a surrender of the right to require a change in the contract or as a means of settling any dispute which is embraced by its terms. Since the contract does not purport to reach all conceivable phases of employer-employee relations, this clause can not well be interpreted as a surrender of the right of self-help, as a measure to protest against unfair labor practices.
 
 
 57
 Substantial evidence supports the Board's finding that the strike was motivated by the Company's unfair labor practices. Indeed, the record suggests that this resort to self-help was directed against a continuing course of conduct on the part of the Company which was in flagrant disobedience to the statutory mandate. The Court of Appeals for the Second Circuit has recently had occasion to consider the contentions here raised in a strikingly similar situation. The Court said, "The right of employees to strike in resistance to unfair labor practices by the employer is a fundamental one which the statute recognizes and no contractual waiver of that right is to be inferred from general provisions in a collective bargaining contract which do not make it clear that strikes caused by the employer's unfair labor practices were included in the prohibition." N. L. R. B. v. Mastro Plastics Corp., 2 Cir., 214 F.2d 462, 464-465, certiorari granted, 1955, 75 S.Ct. 297. We find no authority conflicting with the rule stated.
 
 
 58
 Cases cited by the Company fall largely into two categories, exemplified by two decisions of this court. In N. L. R. B. v. Columbian Enameling & Stamping Co., 96 F.2d 948, affirmed 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660, we refused enforcement of an order to reinstate certain discharged striking employees on the ground that their strike was in violation of a no-strike clause in a contract with Columbian. There, however, the strike was called by the bargaining representative to force the employer to accede to its demands that an existing contract be amended by the addition thereto of a closed shop provision. The other type is illustrated by our decision in United Biscuit Co. v. N. L. R. B., 7 Cir., 128 F.2d 771, where various units of United's employees were represented by three separate local unions, including Locals 431 and 264. Local 431 called a strike against practices which United conceded were invalid under the Act. When the employees in Local 431 went out, the officials of Local 264 called a strike in violation of a no-strike clause in its bargaining agreement with the employer. We denied enforcement of so much of the Board's order as required reinstatement of certain Local 264 employees who had been refused reinstatement after the strike, holding that theirs was a sympathy strike, not one directed against any unfair practice which affected employees of that local. Other cases cited by the Company fit roughly into one or the other of these categories, which, obviously, are to be distinguished on their facts from the case before us.
 
 
 59
 We agree that an unfair labor practice strike is not within the proscription of the provisions of Section 8(d). Section 8(d) (4) requires any party to a bargaining contract who desires to terminate or modify the same to continue "all the terms and conditions of" such contract "in full force and effect, without resorting to strike or lock-out * * * for a period of sixty days after [notice of termination is given] or until the expiration date of such contract, whichever occurs later." 29 U.S.C.A. § 158(d) (4). This section we have interpreted as providing an orderly method for the modification or termination of existing agreements by proscribing, during the sixty day cooling off period, strikes which interfere with the operation of the statutory method, i. e., strikes to compel termination of the agreement or modification of its terms. That section has no application to a strike caused by an employer's unfair labor practices, in no way concerned with questions of termination or modification of the existing agreement. N. L. R. B. v. Mastro Plastics Corp., 2 Cir., 214 F.2d 462, at pages 465-466, distinguishing Local No. 3, etc., v. N. L. R. B., 8 Cir., 210 F.2d 325.
 
 
 60
 The Company's argument that this controversy involves only a dispute between itself and CIO is an oversimplification of the issue. If it were true that the controversy involves only the Company, the AFL and the CIO as legal entities, there might be some justification for a rule which would permit a fight to the finish without interference. But here it appears that this dispute was touched off by widespread employee dissatisfaction with their representation by AFL. And CIO was not reluctant to step in and capitalize the situation. However, the statute guarantees to employees the right to select their own bargaining agent and, as previously pointed out, this sanction inherently includes the right to change bargaining agents by lawful methods without the employees thereby subjecting themselves to coercive acts on the part of the employer. The fate of the employees in such a situation is, indeed, a dire one, if each of the three interested parties is entitled to ignore the statute and to direct his actions accordingly in the promotion of his selfish interests at the employees' expense. That, in the final analysis, is the full scope of the Company's contention. CIO appeared on the scene at the behest of employees. There is no substantial evidence that the campaign was marked by unprotected activities on the part of CIO adherents, unless the strike is to be placed in that category. If the practice of raiding by rival unions needs control, that is a subject for legislative attention, not judicial. It certainly is not for an individual employer to determine for itself how to meet what it considers the exigencies of each individual case. We conclude that the Board was amply justified in holding that the June 20 strike was a protected concerted activity caused by respondent's unfair labor practices.
 
 
 Bias
 
 
 61
 The record does not support the Company's assertion that the Examiner was so biased as to render the order invalid. The principal contention in this respect is that the Examiner discredited all of the Company's witnesses and credited all those called by the General Counsel. This fact, if it had been the fact, would not of itself prove bias. N. L. R. B. v. Pittsburgh Steamship Co., 337 U.S. 656, 658-660, 69 S.Ct. 1283, 93 L.Ed. 1602. Furthermore, in instances where the General Counsel's witnesses were credited over Company witnesses, the question was essentially one of credibility which cannot be disturbed unless we can say that the credited witnesses could not possibly be believed. This we cannot do. Furthermore, the evidence in this respect is free from conflict on most questions. The Company called few witnesses, relying, as it does here, on its contention that the General Counsel had not sustained his burden of proof. Thus, the Company's premises in this respect are merely reargument of the substantial evidence question in different form.
 
 
 62
 The Company raises a further question. The complaint against AFL was continued early in the proceeding before the Examiner, pending approval by the General Counsel in Washington of a settlement agreement with that union. Counsel for AFL then withdrew from the proceedings. The agreement was ultimately disapproved, and AFL reentered the case. The Company objected to this procedure. It fails, however, to show that it was prejudiced by these on again off again tactics of AFL. This manner of proceeding does not indicate bias.
 
 
 63
 Substantial evidence supports the Board's findings that employee Smejkel was discharged for cause, not for engaging in CIO activities, and that, as to the nine strikers, the General Counsel failed to prove that these men had sought and been denied reinstatement. In short, there is no evidence of record relating to the status of these men at any of the pertinent times herein.
 
 
 64
 The petition of CIO is denied.
 
 
 65
 The order against the AFL will be enforced. The order against the Company is modified by deleting the provisions requiring reinstatement of the twenty-two night shift employees, and, thus modified, will be enforced.